[Cite as *In re H.H.*, 2024-Ohio-686.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

In re H.H., M.H.

Court of Appeals Nos.  E-23-011
                                        E-23-012
                                        E-23-017
                                        E-23-018

Trial Court Nos.  2020-JA-007
                             2020-JA-008

**DECISION AND JUDGMENT**

Decided:  February 22, 2024

* * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney, and
Kristin R. Palmer, Assistant Prosecuting Attorney, for appellee.

Lorie K. Brobst, attorney for appellant, K.M.

Autumn D. Adams, attorney for appellant, C.H.

* * * * *

**ZMUDA, J.**

## I.      Introduction

**{¶ 1}** In this consolidated appeal, appellants, C.H. ("Mother") and K.M.

("Grandmother"), appeal from two February 7, 2023 judgments of the Erie County Court

of Common Pleas, Juvenile Division, granting appellee, the Erie County Department of Job and Family Services ("the Department")'s separate motions for permanent custody of Mother's children, H.H. and M.H. ("the Children") and denying K.M.'s motions for legal custody. Finding no error below, we affirm the trial court's judgments.

## A.     Facts and Procedural Background

{¶ 2} On October 7, 2020, the Department filed a complaint alleging that Mother's Children were abused, neglected, and dependent children as defined by R.C. 2151.031, R.C. 2151.03, and R.C. 2151.04, respectively. The Department filed its complaint after being advised on October 6, 2020, that the Children had been the subject of ongoing sexual abuse by Mother's then-fiancé, E.A., and of past abuse by another individual, identified as the children's "uncle" who sometimes lived with Mother. The Department's complaint sought an emergency order granting it temporary custody in addition to prohibiting Mother and the children's father, M.R. ("Father"), from having unsupervised visitation during the temporary custody period.

{¶ 3} The trial court conducted a hearing on the Department's request for temporary custody on October 8, 2020. At the hearing, Mother waived her right to a hearing and consented to the emergency granting of temporary custody to the Department. Father did not appear for the hearing. The trial court granted temporary custody of the children to the Department in an order memorialized that same day. The trial court also set an adjudication hearing for November 6, 2020, with a dispositional

2.

hearing to occur on December 18, 2020.  Finally, the trial court appointed Nic Smith as guardian ad litem for the children.

{¶ 4} The Department next submitted a case plan to the trial court on October 29, 2020.  The plan required Mother, among other obligations, to complete each of the following items:

1. A mental health assessment and to follow all recommendations by her treatment provider;

2. Open up about the abuse her children have endured in mother's home with her treatment providers;

3. Complete an agency approved parenting class, follow all recommendations, and use the skills she has leaned in her interactions with her children;

4.  Cooperate with announced and unannounced home visits at a minimum of monthly; and

5. Allows access to her entire home if requested by agency staff or law enforcement.

{¶ 5} Both Mother and Father appeared for the adjudication hearing on December 3, 2020.  At that hearing, Father admitted to the dependency allegations and approved the case plan.  Mother denied the agency's dependency claim and the matter

3.

was set for a trial on the children's dependency as it related to Mother on December 7, 2020.

{¶ 6} At the adjudication hearing, the Department withdrew its abuse and neglect allegations and proceeded only on its dependency allegation. Mother then admitted to the dependency allegation. The trial court then proceeded with disposition of the dependency claim, finding that the Children were dependent as defined by R.C. 2151.04 and that it would be contrary to the Children's best interest to remain in the home with Mother. As a result, the trial court extended the temporary custody award to the Department with the stated permanent goal of reunification with their parents. To that end, trial court approved the previously submitted case plan and held that the parties were bound by the terms of that plan.[1] The court also ordered that Mother and Father were restrained from any contact with the Children other than as permitted under the case plan pending reunification. The trial court's dependency findings, extension of the temporary custody award, and the conditions set for Mother to abide by the case plan was memorialized in a judgment entry on December 11, 2020. The matter was set for dispositional review on April 2, 2021.

---

[1] Case plan services for Father were not included until the Department filed its March 31, 2022 Motion to Amend Case Plan after Father expressed a desire for reunification. Per the trial court's judgment, Father ultimately requested to be excluded from consideration for reunification and is not part of the present appeal. Any reference to Father's case plan compliance herein is only in relation to resolving Mother and Grandmother's appeals.

4.

{¶ 7} Also on December 11, 2020, following amendments to the case plan,[2] maternal grandmother K.M. ("Grandmother") filed a motion to intervene and a motion for temporary custody or, in the alternative, visitation with the Children. The trial court granted Grandmother's motion to intervene as a party on August 24, 2021. The trial court also granted GAL Smith's motion to add W.S., Grandmother's paramour, as a party to this case. The trial court ordered that all parties were bound by the previously-approved case plan.

{¶ 8} On October 6, 2021, the Department filed its Semi-Annual Review Summary regarding the parties' compliance with the approved case plan. Relevant to the present appeal, the Department noted that Mother and Grandmother were not protecting the Children from harm as they declined to acknowledge that the abuse had occurred and continued to place the children in the care of one of their named abusers. Additionally, W.S. was reported to drink heavily on daily occasions and due to his intoxication he would not be able to care for the children. This was particularly concerning as W.S. would be the caretaker for the Children overnight while Grandmother was working should she be awarded legal custody. As to providing a secure residence, the report

---

[2] The two amendments to the case plan added Mother's additional son to the case plan and amended Mother's obligation to complete the mental health assessment and complete any recommended follow-up treatment. The addition of Mother's additional child and any proceedings related to the termination of her parental rights to that child are not part of this appeal.

5.

noted that Mother did not have shelter or access to shelter and did not reside at the two addresses she provided to the Department. Grandmother and W.S.'s home was reported to be cluttered but not unsafe. The report noted that Mother, Grandmother, and W.S. had a loving relationship with the children but concluded that continued temporary custody with the Department was appropriate. Based on this report, the trial court again extended its order granting temporary custody to the Department at the November 5, 2021 disposition review hearing.

{¶ 9} On July 25, 2022, following an additional extension of the temporary custody order and continuance of the subsequent disposition review hearing, the Department filed its motion for permanent custody. In its motion, the Department argued that the Children had been in its temporary custody for 12 or more months of the previous 22-month period as described in R.C. 2151.414(B)(1)(a). The Department further alleged that during that time, Mother and Father had failed to comply with the terms of the approved case plan. Specifically, the Department alleged that Mother had not procured suitable housing, declined to permit the Department's caseworker to view her home, and has not complied with the mental health requirements of the case plan. As to Father, the Department alleged that he also had not provided secure housing, had not utilized healthy coping mechanisms during stressful times, declined the Department's requests to view his home, and acknowledged that he was not prepared for reunification.

6.

{¶ 10} On August 11, 2022, Grandmother filed her motion for legal custody of both Children. She argued that she had previously exercised significant parental control over the Children and assumed parental duties including those related to schooling, homework, doctor's appointments, and being financially responsible for them. Grandmother also argued that she had a bond with both children that warranted an award of legal custody.

{¶ 11} A two-day hearing on the Department's motion for permanent custody and Grandmother's motion for legal custody began on December 19, 2022. The trial court heard testimony on Grandmother's motion for legal custody first, followed by the Department's only witness, Brooke Molnar, on its motion for permanent custody. The summary of each witness' testimony appears herein in the order that it was heard on Grandmother's motion. We include the entirety of Molnar's separate examination testimony, as it relates to both Grandmother's motion and the Department's motion, in a single summary below. Due to the number of parties participating in each witness's examination, and for ease of reading, we omit reference to whether the testimony was given on direct, cross, redirect, or recross examination, and instead provide an overall summary of each witness's testimony below:

**Testimony of Pastor Jerald Finske**

{¶ 12} Mr. Fenske is a pastor at St. Stephen United Church of Christ in Sandusky, Erie County, Ohio. Grandmother and W.S. are members of his church. Fenske testified

7.

that he knows Grandmother and W.S. as well as the Children through their involvement with Sunday school and bible school programming as well as other various church functions. He described Grandmother and W.S.'s prior interactions with the Children as "nothing but positive." He testified that they had a good relationship with the Children and that they all expressed reciprocal love for one another. Pastor Fenske also testified that during his time knowing Grandmother that she had occasionally sought assistance from the church's food bank but had never sought direct financial assistance. Pastor Fenske concluded his testimony by conceding that he had never observed Grandmother, W.S., or the Children at Grandmother's home.

## Testimony of Brooke Molnar, Department Caseworker

{¶ 13} Ms. Brooke Molnar testified that she is a caseworker with the Department and was assigned to the Children's case to work with the family on case plan services and case management toward reunification or other permanency options for the Children. She had been the Children's caseworker since November, 2020. The Department opened the Children's case in October, 2020, when it received a report that the Children had been the victim of sexual abuse by Mother's then-fiancé, E.A., for the two years prior to bring reported. During the course of the Department's investigation, it was determined that two other individuals also sexually abused the Children. E.A. was convicted for his abuse and sentenced to 8 years in prison. Molnar was not aware of any charges filed against the other two individuals.

8.

{¶ 14} When asked about Grandmother as a potential placement for legal custody of the Children, Molnar testified that Grandmother was added to the case plan when she intervened as a party and that she was obligated to participate in mental health, parenting, and stable housing services in order to comply with the case plan. Molnar testified that Grandmother completed her parenting services obligations by completing a parenting course. As to her compliance with the mental health services, Molnar testified that Grandmother had been engaged in the services for approximately one year before stopping her participation for a period of time. Molnar attributed that break in services to Grandmother's loss of her employer-provided health insurance after she stopped working due to health issues. Molnar testified that Grandmother resumed those services after her health issues resolved and was in compliance the case plan's mental health services. She also noted that W.S. was not compliant with the case plan as he had not attended the recommended mental health treatment for nearly six months at the time of the hearing. She also noted that he had been assessed for alcohol abuse but had not participated in any treatment.

{¶ 15} Molnar testified that Grandmother had retained the same housing for the duration of the Children's case. Molnar performed home visits at Grandmother's residence where she found the home to be "cluttered" but with clean aisleways to allow movement through the home. She also noted that other relatives had recently lived with Grandmother in the room designated for the Children. Molnar was concerned that one of

9.

the uncharged abusers of the Children was the child of those relatives. The room in which they were staying did have beds for the Children but they did not have mattresses. Molnar described the condition of the room as "deplorable" and discussed having the relatives move out of Grandmother and W.S.'s residence. She noted that the room would be appropriate for the Children once it was clean and the beds were set up "appropriately."

{¶ 16} Approximately two weeks later, Grandmother advised Molnar that the relatives had moved out of the residence. Molnar then returned to the residence and found that the room had been cleaned but that boxes were now stacked on the beds. Grandmother advised Molnar that if she was awarded custody of the Children that she had family members who were willing to purchase mattresses for the beds.

{¶ 17} Overall, Molnar found Grandmother had been "compliant" with the case plan services. However, Molnar had already informed Grandmother "from day one" that because she had previously lost permanent custody of her own children in 2000 that the Department would not utilize her as a placement option for the Children—although she later conceded that this was not an absolute bar to the trial court granting custody of the Children to Grandmother.

{¶ 18} Molnar also testified that Grandmother was not a secure placement option for the Children because of the Department's concern that she did not adequately protect the children after they disclosed their abuse to her. Molnar believed that Grandmother

10.

had been aware of the Children's allegations against E.A. prior to being reported to the Department, despite Grandmother's denial of that fact. Molnar also had concerns that the Children, aged 10 and 12 at the time of the hearing, had hygiene issues inappropriate for their level of development. Overall, Molnar stated that her concerns over Grandmother's failure to protect the Children from the abuse and her concerns over the home would have resulted in the Department finding Grandmother was not a placement option even had she not lost permanent custody of her own children.

{¶ 19} Prior to the Department's involvement, the Children were spending "a couple of days a week" with Grandmother despite Mother still having custody. Molnar was unaware of who ensured that the Children attended school or otherwise provided for them prior to the Department's involvement.

{¶ 20} Molnar next discussed her observations of the Children both in foster care and as the supervisor of visitations with Mother and Grandmother. During those visits, Molnar observed the Children were "okay" with one another. She was aware of reports that the Children fought a lot when she was not there but that they were excited to see her during her visits so her time with them was "positive." She also noted that the Children's behavior, school work, and hygiene were all significantly improved while in foster care. She also described the Children's special needs as it related to therapy related to the abuse. Both Children were engaged in therapy sessions that occurred multiple times per week. Their foster parents were able to take them to each session and provide support at

11.

home related to the treatment received in those sessions. Molnar questioned whether Grandmother and W.S. would be able to provide the necessary support to allow both Children to attend all therapy sessions and follow the therapists' recommendations between sessions.

{¶ 21} Molnar testified that if the Department was granted permanent custody of the Children, that it would seek adoptive parents for their permanent placement. She conceded that she could not guarantee that they would be adopted together but that was the Department's intent when pursuing adoption for siblings. She also described the Department's intent to keep adopted Children within the same school district if possible. The Department also seeks adopting families that will encourage relationships with the adopted children's other siblings.

{¶ 22} Describing the Department's obligations before seeking permanent custody, Molnar stated that it must "exhaust" all options for legal custody to be granted to other individuals before proceeding with a permanent custody motion. Other than Grandmother, Mother and Father did not provide the Department with any other potential placements for the Children before the motion for permanent custody was filed. Molnar stated that it was her professional opinion that Grandmother was not a suitable placement largely due to her failure to protect the Children from past abuse which raised questions about how Grandmother would respond if any similar situations arose in the future.

12.

**{¶ 23}** In addition to addressing potential placement with Grandmother, Molnar testified regarding the Department's motion for permanent custody that, if granted, would terminate Mother's parental rights. She reiterated that Mother had custody of the Children at the beginning of the Department's involvement. Molnar did not write the original case plan but testified that she reviewed the plan and was responsible for all amendments during the proceedings below. She believed that the case plan was appropriate to address any issues that would prevent Mother's reunification with the Children.

**{¶ 24}** Most concerning to Molnar regarding potential reunification with Mother was that Mother had initially denied that E.A. had abused the Children and continued living with him after the Children were placed in the Department's temporary custody. After he was indicted, Mother then began a relationship with one of the other men the Children said had abused them. Molnar also believed that one of the other individuals living with Mother at the time the Department became involved was also a sex offender. In light of this, the case plan required Mother to provide secure housing for the Children. The case plan also required Mother to financially support the Children which would require her continued employment. The plan also required Mother to participate in mental health assessment and any recommended treatment, and to take recommended parenting classes.

13.

{¶ 25} Mother did complete the parenting portion of the case plan. During her supervised visits with the Children, they are all happy to see one another and Molnar described them as having a loving relationship. However, Molnar also noted that Mother had difficulty controlling the Children, often requiring the supervisor at their visits to step in and assist. Mother also brings electronic devices on some visits and allows the Children full access to them. On two separate visits, Molnar observed Mother leaving the Children alone without telling them while she went to the bathroom and using a community splash pad to wash the Children's dishes.

{¶ 26} While initially failing to comply, Mother did eventually complete the mental health assessment. The results of that assessment were that Mother was defensive during the questioning and exhibited poor judgment. It was recommended that Mother continue receiving mental health treatment. She attended several follow-up appointments before stopping in July, 2022. She returned for another appointment in October, 2022, and one just prior to the hearing. Molnar described Mother's participation in the mental health counseling as "sporadic" and stated that Mother had not substantially complied with the mental health treatment requirements of the case plan.

{¶ 27} Molnar also stated that Mother has not complied with the housing portion of the case plan. At the time of the hearing, Mother was living in a two-bedroom apartment with her boyfriend and four other adults. Mother refused to allow Molnar to visit the apartment and stated that if Molnar showed up that she would not be allowed

14.

inside. As a result, face-to-face visits between Molnar and Mother only occurred at the Department or during Mother's supervised visits with the Children.

{¶ 28} Mother's counsel questioned Molnar directly about whether the Department could have offered any additional assistance, either financial or otherwise, to assist Mother with completing the case plan. Molnar stated that Department assistance was available but that Mother did not seek any assistance, as she did not appear determined to complete the case plan services. Further, Molnar discussed with Mother that completing the case plan services would not guarantee reunification, but that Mother had to implement the practices learned through those services in order to be reunited with the Children. Molnar did not see Mother apply any of the newly-learned parenting and coping skills during her visits with the Children.

{¶ 29} The primary factor preventing Mother's reunification with the Children, according to Molnar, was Mother's inability to provide them with secure housing. Mother initially refused to believe that E.A. had abused the Children and continued to live with him through the initial phases of his criminal proceedings. For that reason, Molnar believed that Mother would not protect the Children from future abuse. Molnar also stated that Mother's current residence, a small apartment with 6 adults, was not an appropriate placement for the Children. Choosing to live in this environment, Molnar stated, was similar to her inability to protect the Children from E.A.'s abuse while he was living in her residence. It was also these decisions that warranted the Department's

15.

development of the mental health case plan services as Mother did not express any concerns about her current living situation, or what she would have done differently in the past to have prevented the Children's abuse.

{¶ 30} Molnar testified that the Children both required significant therapy related to their abuse as well as treatment for ADHD. She had concerns over the Children's lack of boundaries, particularly with men, in that they would "hang" on and go with anyone that asked them too. The Children also do not have an age-appropriate understanding of physical boundaries and have inappropriately discussed sex and anatomy with others. H.H. had recently been found searching for "naked" videos on a tablet computer. Molnar also noted that H.H., now 12 years old, had a maturity level comparable to a toddler. Molnar believed that M.H. was closer to an age-appropriate maturity level. Molnar believes that the Children's lives have improved while in foster care. She again noted that their behavior, grades, and hygiene are all better with the support of their foster parents.

{¶ 31} For these reasons, Molnar concluded that reunification with Mother was not a secure legal placement. She also determined that granting legal custody to Grandmother would not provide the Children with a secure legal placement. She requested that the trial court grant permanent legal custody of the Children to the Department so that they could find permanent secure placement for the Children through adoption.

16.

## Testimony of Nicholas Smith, Guardian Ad Litem

{¶ 32} Mr. Smith testified that the Children, Grandmother, and W.S. had a close relationship. They engaged in brief monthly visits but also had weekly phone calls during the Department's underlying case. The Children refer to Grandmother and W.S. as "Nana" and "Paw Paw." In his last conversation with them before testifying at the hearing, the Children informed Smith that they wanted to see Grandmother and W.S. again after the hearing. He expressed concern that the Children did not understand the nature of the current proceedings in light of that conversation.

{¶ 33} Smith also expressed concerns over Grandmother's health in light of a recent COVID diagnosis and pneumonia that required her to be on oxygen treatments. He noted that although she had recovered, that she was not in "the greatest of health." He did not have any concerns about Grandmother's mental health. Smith believed that even with his concerns over her physical health that Grandmother was physically fit enough to meet the needs of the Children should she be granted custody. He did, however, note that Grandmother previously lost custody of her own children.

{¶ 34} W.S.'s lack of mental health counseling and his alcoholism did raise concerns for Smith. He also noted that at a recent, preplanned visit, W.S. appeared at the door in flip-flops and a bathing suit. Smith later discussed W.S.'s appearance with the Children but they denied that W.S. had engaged in any inappropriate behavior with them.

17.

{¶ 35} During his time as the Children's GAL, Smith learned that Grandmother had provided a significant amount of care in the years prior to the Department being granted temporary custody. That care, however, was always guided by Mother's directions.

{¶ 36} Smith also testified about Grandmother's ability to ensure that the Children received all of the care necessary for secure placement. He noted that the H.H. was on an individual education plan at school that required more guardian involvement than most students. He also questioned Grandmother's ability to get the Children to their numerous therapy and medical appointments, particularly in light of her overnight work schedule. Lastly, Smith testified that although Grandmother's house was "in pretty bad shape" during his first visit, it was in better condition and only "cluttered" during his most recent visit. He recommended that regardless of the outcome of the proceedings that the Children should continue their relationship with their Grandmother.

{¶ 37} At the outset of his time with the Children, they told Smith that they wanted to return to Mother as soon as possible. He testified that over time, they have also discussed returning to Grandmother's and expressed interest in having a "new family." Smith testified that the Children did not appear to have a clear understanding of the ongoing proceedings and, therefore, found that their statements provided little insight into their true desired outcome.

18.

**{¶ 38}** As to his ultimate conclusion, Smith testified that based on all of the concerns he had regarding Grandmother and W.S., that Grandmother would not provide a secure placement for the Children and that permanent custody should be granted to the Department.

## Testimony of W.R.

**{¶ 39}** W.R. is Grandmother's cousin. He testified that he and Grandmother have a close relationship. He had previously observed Grandmother with the Children on numerous occasions. He stated that Grandmother provided the Children with stability that they would not receive otherwise. He also stated that Grandmother provided the Children with basic necessities and that she was a "major" part of their lives prior to October, 2020. W.R. never noticed the Children having any hygiene issues. He also testified that Grandmother's house was "clean" as of his visit approximately one month prior to the hearing.

## Testimony of Carolyn Willinger

**{¶ 40}** Ms. Willinger is the Children's former Kindergarten teacher and cheer coach. She testified that Grandmother and W.S. were very active in the Children's school activities. They participated in conferences with her, would attend events at the school, and often dropped off and picked up the Children. She testified that the Children would frequently come to school with lice and the issue would only be resolved if she

19.

contacted Grandmother and W.S. Mother was not at as many events as Grandmother and W.S., but would attend as often "as she could."

### Testimony of W.F.

{¶ 41} W.F. is Grandmother's stepfather. He was aware of Grandmother's prior contact with the Department in which she lost custody of her children. He testified that Grandmother is more mature than she was at that time. W.F. described Grandmother's interactions with the Children as positive and that he had no concerns about their relationship.

### Testimony of R.F.

{¶ 42} R.F. is Grandmother's stepmother. She was also aware of Grandmother's prior contact with the Department. She testified that Grandmother has "grown up a lot" since then. She described the Children's relationship with Grandmother and W.S. as positive and noted that any time they visited, the Children were with them.

### Testimony of Dina Dudin

{¶ 43} Ms. Dudin is a therapist at Bayshore Counseling. Grandmother became Dudin's patient beginning on April 29, 2022. Grandmother was receiving treatment from a different therapist beginning on August 31, 2021. Dudin was familiar with all of Grandmother's prior treatment and reviewed all records from that prior treatment when Grandmother became her patient. Dudin testified that Grandmother had 29 therapy sessions since beginning treatment with the prior therapist up to the date of the hearing.

20.

Grandmother typically has therapy sessions once every two to three weeks, a schedule Dudin described as "typical."

{¶ 44} Dudin counsels Grandmother primarily for depression. She stated that Grandmother's depression was triggered by the removal of the Children from her life following the granting of temporary custody to the Department. Dudin noted that Grandmother also received initial treatment for her depression from Dr. Jama.[3] Dr. Jama prescribed medication to Grandmother and Dudin testified that Grandmother was "compliant" with her medication.

{¶ 45} Dudin described Grandmother's progress under her treatment plan as "very good." Grandmother has consistently attended her sessions and her depression symptoms have decreased while her coping skills have increased. Dudin did not offer an opinion on how long Grandmother would need to be in therapy as that decision is "driven by the client." Dudin could not identify any concerns that she believed would prevent Grandmother from caring for the Children if she was awarded custody. She did concede, however, that Grandmother's therapy focused on her depression and did not focus on how Grandmother would protect the children from abuse.

---

[3] Dr. Jama's full name was not provided.

21.

**Testimony of Grandmother**

{¶ 46} Grandmother began her testimony describing her relationship with W.S. She and W.S. had been romantically involved since 2005. The Children and Mother all lived with Grandmother and W.S. from prior to H.H.'s birth until Mother had her third child in 2018. Approximately half of the last year they were living together, the family lived in hotels.

{¶ 47} Grandmother described herself as the Children's "primary caregiver" during that time despite the fact that Mother also lived in the residence and at the hotel. She testified that she and W.S. were responsible for getting the Children to school and to any scheduled appointments. During the latter part of their living in hotels, Mother and her youngest child moved into a separate residence and Grandmother and W.S. provided all care for the Children after that. Grandmother and W.S. attended all of the Children's school functions as well as parent-teacher conferences during that time. They also enrolled the Children in a cheer program and attended those classes and events. Grandmother also ensured that the Children took all prescribed medicine and developed study games to help them with school. Grandmother testified that from 2018 to 2020, the Children spent approximately half of their time at her residence with her and W.S. She described her relationship with the Children during that period as "awesome."

{¶ 48} After Mother and the Children moved out in 2018, Grandmother only saw the Children on weekends. Grandmother and W.S. moved into their current residence

22.

that same year. Grandmother also believed that Mother started dating the Children's abuser, E.A., in 2018 but was not sure as to the specific timing. She did not see E.A. frequently, but he did pick up the Children from her on occasion. She recalled one occasion when the Children came back from Mother's house and were crying but would not explain why. She confronted E.A. and he stated that the Children were upset because they got in trouble. She testified that she did not care for E.A. and that his presence put a strain on her and Mother's relationship.

{¶ 49} Prior to the Department's involvement, Grandmother and W.S. were still providing care for the Children as they spent time at their residence. W.S. would typically walk the Children to the bus stop each morning and would be waiting at the bus stop to pick them up after school.

{¶ 50} At the time of the hearing, Grandmother was employed with Erie Residential. Her job involved "taking care" of adults that were "mentally challenged." This involves cooking, cleaning, and performing general household chores for the residents. Her shift is from 10:30 p.m. until 8:00 a.m. the following morning. She is off on Wednesdays and Saturdays. W.S. is not employed but receives Social Security Income. W.S. takes care of the Children while Grandmother is working. She testified that her and W.S.'s income is sufficient and that she does not seek financial assistance.

{¶ 51} Grandmother next addressed the Children's eventual reporting of their abuse to her. Grandmother testified that H.H. began seeing the school counselor in first

23.

grade but Grandmother was not advised as to the nature of the counseling. She expressly denied that the school counselor informed her that the Children were being sexually abused. She stated that M.H. never saw the school counselor.

{¶ 52} Grandmother also recalled an incident prior to Department's intervention in which she took H.H. to the doctor after H.H. informed her that she had some bloody vaginal discharge. The doctor diagnosed her with a urinary tract infection. Grandmother denied that H.H. had informed her of the abuse at that time. However, later in her testimony, when presented with evidence that she previously believed this incident to have been related to sexual abuse, Grandmother could not deny that she had made such a statement.

{¶ 53} Eventually, the Department's intervention resulted from an incident that occurred on October 4, 2020, when H.H. began throwing a tantrum as Grandmother was preparing to return the Children to Mother. H.H. asked Grandmother not to send them back but would not explain why. Grandmother believed that something was wrong and contacted the police. The police informed her to return the Children to Mother because she had legal custody. She then reached out to Mother who told her not to return the Children.

{¶ 54} The following evening, Grandmother was riding in her car with a friend and the Children. The friend informed Grandmother that H.H. had confided in her that E.A. was "playing doctor" with the Children. Grandmother confirmed this with the

24.

Children. She immediately drove to the Sandusky Police station and filed a report regarding the abuse. The following morning, Grandmother received a call from the Department to present the children at their office for "forensic testing." Grandmother was working during the day at that time and was at work when she received the call. She had her parents take the Children for the testing and she picked them up and returned home afterward. Representatives from the Department and a Sandusky police officer picked up the children later that evening.

{¶ 55} Since that time, Grandmother and W.S. were allowed to see the Children for 15-minute supervised visits once a month until just prior to the hearing when the time period was extended to one hour. The Children were always excited to see Grandmother and W.S. She testified that the short nature of these visits makes the Children upset and act out against Department staff.

{¶ 56} Grandmother next described her previous interaction with the Department when she lost parental rights over her own three children. She stated that at the time she was 21 years old, immature, financially unstable, and in an abusive relationship. She described herself at the time of the hearing as being more mature, a better person, and healthier.

{¶ 57} She conceded that W.S. had not completed the alcohol counseling services as required by the case plan since he "was not there for a while" for his scheduled appointments. She testified that W.S. drinks three beers per day and she was not aware

25.

that W.S. had tested positive for alcohol consumption at his most recent assessment. When presented with the case plan that required W.S. to "maintain sobriety," Grandmother stated her understanding that this meant he was to consume no alcohol. She excused W.S. having three beers per day while he was supposed to be maintaining sobriety because he had not, to her knowledge, tested positive for alcohol at his assessments. She later acknowledged that W.S. needed help, however, because while she did not consider his drinking a problem currently, she felt it could lead to a problem.

### Close of Hearing and Trial Court Judgment

{¶ 58} At the conclusion of the hearing, all parties waived closing arguments. The trial court took the matter under advisement. The trial court rendered nearly identical decisions in each case on February 7, 2023. In those judgments, the trial court, having considered the factors required under R.C. 3109.04(F)(1), held that it was in the Children's best interest to deny Grandmother's motion for legal custody. The trial court then, having considered the factors identified under R.C. 2151.414(D)(1), determined that it was in the Children's best interest to grant permanent custody to the Department. The trial court, therefore, ordered that Mother's parental rights, privileges, and responsibilities as to the Children were terminated and that permanent custody was granted to the Department.

26.

## B.    Assignments of Error

{¶ 59} Mother timely appealed and asserts the following error for our review:

1.  The finding or permanent custody was against the manifest weight of the evidence.

{¶ 60} Grandmother timely appealed and asserts the following error for our review:

1.  The trial court abused its discretion when if found that it is in the children's best interest to grant permanent custody of them to the Erie County Department of Job and Family Services (EDJFS) rather than place the children in the legal custody of [Grandmother].  In doing so, the trial court erroneously found that it was in their best interests to permanently end their relationship with their parents and blood relatives.  The trial court also erred in finding that ECDJFS provided reasonable support to Grandmother to facilitate her case plan progress.  The decision of the trial court is therefore against the manifest weight of the evidence.

## II.    Law and Analysis

## A.    Standard of Review

{¶ 61} Before addressing the merits of the parties' arguments, we first must clarify the appropriate standard of review for each appellant's assigned error.  In *In re. Z.C.,* 2023-Ohio-4703, --N.E.3d--, the Ohio Supreme Court resolved a certified conflict

27.

between two Ohio appellate districts regarding the appropriate standard of review for permanent custody decisions made pursuant to R.C. 2151.414. *Id.* at ¶ 1. Specifically, the court was asked to determine whether the appropriate standard of review of such a decision was abuse of discretion or sufficiency of the evidence and/or manifest weight of the evidence. *Id.* The court ultimately concluded that the appellate standard of review for a permanent custody decision was sufficiency of the evidence/manifest weight and not abuse of discretion. *Id.* at ¶ 18.

{¶ 62} Recognizing that sufficiency and manifest weight are separate and distinct standards, the court stated that the appellate court must apply the standard "as appropriate depending on the nature of the arguments that are presented by the parties." *Id.* Here, Mother expressly frames her alleged error in the trial court granting the Department's motion for permanent custody as being against the manifest weight of the evidence presented at trial. Therefore, we review her assigned error under a manifest weight standard of review.

{¶ 63} Grandmother's assigned error alleges that the trial court's denial of her motion for legal custody was both an abuse of discretion and against the manifest weight of the evidence. Careful review of *In re. Z.C.* shows that the Ohio Supreme Court was not asked, nor did it make, a clarification on the standard of review applicable to the denial of a motion for legal custody pursuant to R.C. 2151.353(A)(3) and is inapplicable

28.

to Grandmother's assigned error.  Instead, we previously established the correct standard of review in *In re. K.S.*, 6th Dist. Huron No. H-21-020, 2022-Ohio-2810.

{¶ 64} "Legal custody proceedings vest in the custodian the right to have physical care and control of the child, subject to any residual rights and responsibilities that remain intact with the birth parents." *Id.* at ¶ 17.  "Because custody determinations are 'some of the most difficult and agonizing decisions a trial court must make,' a trial court judge must have broad discretion in considering all of the evidence." *Id.*, citing *Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997).  "Therefore, an award of legal custody will not be reversed on appeal absent an abuse of discretion." *Id.*  For these reasons, we find that our review of the trial court's denial of Grandmother's motion for legal custody is for an abuse of the trial court's discretion and not, as Grandmother suggests, whether that decision is against the manifest weight of the evidence.

{¶ 65} Having determined the appropriate standard of review, we turn to the merits of the parties' assigned errors.

### B. The trial court's denial of Grandmother's motion for legal custody was not an abuse of discretion.

{¶ 66} As determined above, we review the trial court's denial of Grandmother's motion for legal custody for an abuse of discretion.  *K.S.* at ¶ 18.  "To constitute an abuse of discretion, the ruling must be unreasonable, arbitrary, or unconscionable." *Id.*

{¶ 67} An award of legal custody for a child that has been adjudicated neglected, dependent, or abused is authorized pursuant to R.C. 2151.353(A)(3).  *K.S.* at ¶ 19.  Any

29.

decision granting legal custody to an individual other than a custodial parent must consider the best interests of the child. *Id.* A trial court may consider a number of factors in determining the best interests of the child including those identified in R.C. 2151.414(D), R.C. 3109.04(F)(1), "a combination of the two, or general notions of what should be considered regarding the best interests of the child." *Id.*, citing *In re. E.H.,* 6th Dist. Ottawa No. OT-15-044, 2016-Ohio-8170, ¶ 16. In her brief, Grandmother argues that granting permanent custody to the Department is not in the Children's best interest and that the trial court did not consider her completion of the case plan services when it rendered its decision. As a result, she argues, the trial court abused its discretion in denying her motion. We disagree.

{¶ 68} In its detailed decision, the trial court reviewed the evidence presented at the hearing under the applicable factors in R.C. 3109.04(F)(1)(a) through (j) and "other relevant factors." Notably, the trial court addressed multiple factors that weighed in favor of placement with Grandmother being in the Children's best interest. These included Grandmother's desire to obtain legal custody, Grandmother's compliance with the case plan services related to her mental health care, Grandmother and W.S.'s strong interactions with the Children, and Grandmother's testimony that she would abide by any court rulings. The trial court's judgment also considered factors that weighed against placement with Grandmother including the GAL's recommendation that permanent custody be granted to the Department, the Children's improvement at school since being

30.

placed in the Department's temporary custody, Grandmother's history of unstable housing, Grandmother's lack of insight necessary to recognize the Children's signs of abuse, particularly when coupled with H.H.'s Kindergarten teacher recognizing the need for intervention, Grandmother's inability to maintain a safe and clean home for the Children, and W.M.'s refusal to address his alcohol use.

{¶ 69} The court noted its consideration of each of these factors in ultimately determining that denial of Grandmother's motion for legal custody was in the Children's best interests. Having reviewed the record, we find that the trial court's decision was not arbitrary, unreasonable, or unconscionable. Grandmother's argument that the trial court did not consider her compliance with the case plan services or the "significant factor" of her and W.S.'s bond with the Children is directly refuted by the trial court's express consideration of those factors.

{¶ 70} Put simply, the trial court determined that it was in the Children's best interests to deny Grandmother's motion for legal custody *in spite* of her bond with the children and her continued compliance with the case plan services. This was merely one of the "difficult and agonizing" decisions related to child custody on which we must afford that trial court its broad discretion. *K.S.* at ¶ 18. While Grandmother's arguments identify factors that weighed in favor of granting her motion for legal custody, we cannot say that the trial court's careful consideration of all of the relevant factors in denying her motion was arbitrary, unreasonable, or unconscionable. As a result, the trial court did not

abuse its discretion in denying Grandmother's motion for legal custody and her assignment of error is found not well-taken.

### C. The trial court's grant of permanent custody to the Department is not against the manifest weight of the evidence.

{¶ 71} In her single assignment of error, Mother argues that the trial court erred in granting permanent custody to the Department. Specifically, she argues that the trial court only considered one factor described in R.C. 2151.414(D) to find that it was in the Children's best interests to be placed in the permanent custody of the Department. She argues that by considering only one factor and not considering the others that weighed in her favor, that the trial court's judgment was against the manifest weight of the evidence.

{¶ 72} "R.C. 2151.414 sets out specific findings a juvenile court must make before granting an agency's motion for permanent custody of a child." *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-2102, 184 N.E.3d 1, ¶ 18. In these cases, the juvenile court "must find by clear and convincing evidence (1) that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies and (2) that a grant of permanent custody is in the child's best interest." *Id.* Mother does not dispute that the Children were in the Department's custody for 12 or more months of a consecutive twenty-two-month period, establishing the predicate condition described in R.C. 2151.414(B)(1)(a). Therefore, we limit our review to Mother's argument that the trial court's best interests findings were against the manifest weight of the evidence.

32.

{¶ 73} The relevant statute, R.C. 2151.414(D)(1), provides:

In determining the best interest of a child * * *, the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 74} R.C. 2151.414(D)(1) does not require a juvenile court "to expressly discuss each of the best-interest factors." *In re A.M.* at ¶ 31. "Consideration is all the statute requires, [but] a reviewing court must be able to discern from the magistrate's or juvenile court's decision and the court's judgment entry that the court satisfied the statutory requirement that it consider the enumerated factors[.]" *Id.* at ¶ 31.

33.

**{¶ 75}** Under a manifest weight standard of review, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). But, while we review the evidence and consider the witnesses' credibility, we must be mindful that the juvenile court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *In re P.W.,* 6th Dist. Lucas No. L-12-1060, 2012-Ohio-3556, ¶ 20. Its discretion in determining whether an order of permanent custody is in the best interest of a child "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." (Internal quotation marks and citations omitted.) *In re C.P.*, 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 10.

**{¶ 76}** Initially, we note that Mother's argument that the trial court's judgment was against the manifest weight of the evidence is premised on a misstatement of the trial court's judgment. Mother argues that the trial court "only found that [the Children] have a substantial relationship with [her] and that the [Children] were bonded with their foster parent." By making only this single finding, she continues, the trial court erred by not considering "whether Mother substantially remedied the conditions which caused the children to be removed." Because she alleges that the conditions that warranted the

34.

granting of temporary custody have been removed through her compliance with the case plan, Mother is arguing that the trial court failed to consider whether legally secure placement could be achieved without a grant of permanent custody to the agency as described in R.C. 2151.414(D)(1)(d)—a factor she alleges the trial court did not consider. Review of the trial court's judgment reveals that the trial court expressly considered that factor. As a result, Mother's argument is without merit.

{¶ 77} Further, Mother's argument that she has completed all of the case plan services except for providing independent housing is belied by the record. The case plan obligated Mother to seek a mental health assessment and to complete all recommended treatment. Mother's caseworker, Molnar, testified that although Mother completed the initial assessment and attended her initial treatment sessions sporadically, Mother had not attended any treatments for a three-month period leading up to the hearing.

{¶ 78} Additionally, Mother's argument that obtaining "independent housing was the only case plan service not fully completed" is misleading. First, not only did Mother's case plan require her to find secure housing for the Children, it obligated Mother to cooperate with the Department on announced and unannounced visits to her residence and to provide the Department access to her home during its visits. Molnar testified that Mother would not give her access to her residence and informed her that if she arrived unannounced, the other adults that she was living with at the time would not allow her to enter the residence. Second, Mother's choice to live with five other adults,

35.

including at least two men, caused Molnar concern in light of the Children's ongoing personal boundary issues with men and the nature of their previous abuse. Considering this evidence, we find that Mother's obligation to provide the Children with secure housing was not simply incomplete, but that Mother had affirmatively acted in direct contravention of this obligation.

{¶ 79} Finally, as to Mother's general argument that the trial court erred in finding that it was in the Children's best interests to grant permanent custody to the Department, we find that the court considered all of the necessary factors and, weighing the evidence, that the trial court did not lose its way in granting the Department's motion for permanent custody. *In re. A.M.* at ¶ 31. Although it was not required to, the trial court's judgment expressly noted its consideration of each of the required best interest factors and stated its conclusion as to the weight of those factors. The evidence presented at the hearing supports each of the trial court's conclusions based on those factors, including those that weigh in favor of denying the Department's motion and those that weigh in favor of granting the Department's motion. Based on that evidence, and its consideration of the required statutory factors, we cannot say that the trial court lost its way in awarding permanent custody of the Children to the Department. Just as with Grandmother's motion, the trial court merely made a difficult decision that was adverse to Mother's wishes.

36.

**{¶ 80}** For these reasons, we find that the trial court's judgment was not against the manifest weight of the evidence and that Mother's single assignment of error is found not well-taken.

### III.    Conclusion

**{¶ 81}** For the foregoing reasons, we find that the trial court did not abuse its discretion in denying Grandmother's motion for legal custody and that its granting an award of permanent custody of the Children to the Department was not against the manifest weight of the evidence.  As a result, we find that Grandmother and Mother's respective single assignments of error are found not well-taken and we affirm the February 7, 2023 judgments of the Erie County Court of Common Pleas, Juvenile Division.

**{¶ 82}** Mother and Grandmother are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgments affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.                    _____
                                                                        JUDGE
Myron C. Duhart, J.

                                                                _____
Charles E. Sulek, P.J.                              JUDGE
CONCUR.

                                                                _____
                                                                        JUDGE

37.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.