[Cite as *In re. O.S.*, 2025-Ohio-776.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

In re O.S., C.S., L.S.

Court of Appeals No.   E-23-048
E-23-049
E-23-050

Trial Court No.  2022 JB 004
2022 JB 005
2022 JB 006

**DECISION AND JUDGMENT**

Decided:  March 7, 2025

* * * * *

Zachary E. Dusza, for appellant, M.F.

* * * * *

**ZMUDA, J.,**

## I.  Introduction

{¶ 1} In this consolidated appeal, appellant, M.F., appeals from the August 7, 2023 judgment of the Erie County Court of Common Pleas, Juvenile Division, granting judgment in favor of appellee, T.S., on his complaint for custody of the parties' children, O.S., C.S., and L.S.  Finding no error below, we affirm the trial court's judgment.

## A. Facts and Procedural Background

{¶ 2} At the outset, we note that there are multiple, non-parties, including other juveniles not subject to the trial court's order, that were referenced at trial. We make efforts to protect the anonymity of juveniles in our opinions by identifying them by their initials or other generic terms. Sixth Dist.Loc.R. 10(C). Because the use of initials here would likely result in confusion, particularly since many of the individuals described in the testimony share similar initials, we utilize the following monikers to refer to the individuals identified herein:

- M.F., appellant, will be referred to as "Mother;"

- T.S., appellee, will be referred to as "Father;"

- O.S., C.S., and L.S., Mother and Father's children, will be referred to individually by their initials and collectively referred to as "the Children;"

- S.H., Father's fiancé, will be referred to as "Fiancé;"

- J.Z., Mother's boyfriend during certain relevant time periods, will be referred to as "Boyfriend;"

- E.S., Boyfriend's ex-wife, will be referred to as "Roommate;" and

- Boyfriend and Roommate's children, neither of whom are subject to the trial court's custody order, will be referred to as "Roommate's Children."

All other individuals are identified by name, title, or their relationship to the Children.

{¶ 3} This appeal arises from a custody dispute between Mother and Father over their three children. Mother and Father were never married. It is undisputed, however,

2.

that they were in a relationship for various periods between 2013 and 2021. The Children were born during that time period.

{¶ 4} After the parties separated and by informal agreement between the parties, the Children lived with Mother, Boyfriend, Roommate, and Roommate's Children. While living there, the parties' youngest child, L.S., suffered several injuries. These injuries included bruising, a broken leg, and a subdural hematoma. Lorain County Children's Services ("the Agency") was made aware of the injuries after L.S. was admitted to the hospital on December 14, 2021. The Agency requested, and the parties agreed to, the initiation of a safety plan that same day. The terms of the safety plan required the Children to be placed with Father while the Agency conducted its investigation to determine whether the Children had been abused.[1]

{¶ 5} On January 10, 2022, while the investigation was pending, Father filed three complaints for parentage, allocation of parental rights and responsibilities, and parenting time. Each complaint related to one of the parties' Children, respectively, and was assigned a separate case number.[2] Contemporaneous with his complaints, Father filed motions for emergency custody of the children. In his motion, Father alleged that the Children were in immediate danger, had been abused at Mother's residence, and that the

---

[1] Roommate's children were also removed from Mother's home while the agency conducted its investigation. We omit reference to that portion of the investigation except where necessary for resolution of this appeal.

[2] While there is no specific order consolidating these actions, the trial court conducted all proceedings simultaneously while filing separate orders and judgment entries under each respective case number.

3.

Children must be placed in his custody to prevent their physical or emotional harm. Specifically, he alleged that the two younger Children had been "covered in bruises" and that the youngest, L.S., had recently been to the emergency room for a leg fracture and a possible head injury. Father further alleged that on a second occasion, L.S. was admitted to the hospital for a "brain bleed." The trial court, proceeding ex parte, granted Father's motion for an emergency order the same day, finding that it would be contrary to the Children's welfare to be returned to Mother's home. The trial court scheduled a probable cause review hearing on its ex parte order for January 18, 2022.

{¶ 6} Following a continuance, the hearing took place on February 16, 2022, before a magistrate. Both Mother and Father testified at the hearing. Mother testified that the Agency had determined that any abuse allegations against her had been found to be "unsubstantiated." She also testified that although the Agency had found abuse allegations against Roommate to be "indicated," Roommate had since moved out of Mother's residence. Father testified that Mother's residence still subjected the Children to abuse and further injury. Based on that testimony, the magistrate determined that there was probable cause for the issuance of the emergency order and ordered the Children to remain with Father. The magistrate entered an order reflecting those findings on April 21, 2022.

{¶ 7} Mother filed her preliminary objections to the Magistrate's decision on May 26, 2022. She argued that the abuse allegations against her had been resolved as "unsubstantiated" by the Agency and that the magistrate incorrectly determined that the

4.

emergency custody order was necessary. The trial court overruled Mother's objections on August 10, 2022.

{¶ 8} While Mother's objections were pending, she filed a motion requesting the appointment of a guardian ad litem ("GAL") on June 22, 2022. The trial court granted Mother's motion and appointed Janene Murphy as the guardian ad litem for the Children on July 5, 2022.

{¶ 9} The matter ultimately proceeded to trial on June 1, 2023. The testimony elicited at trial is summarized below. [3]

## Testimony of Father

{¶ 10} Father testified that he had been at his then-current residence for two years prior to the trial. At the time of the trial, he had been employed for a "couple months." This employment followed a brief period of layoffs and stretches of unemployment over the two prior years. He stated that he planned to remain with his current employment "in the foreseeable future."

{¶ 11} Father next testified as to his relationship with the Children and his concerns about Mother's alleged abuse. At the time of the trial, O.S. was 8, C.S. was 4, and L.S. was 3. Father and Mother first began their romantic relationship on June 3, 2013. They were originally in a relationship for three years, during which O.S. was born, before breaking up. Approximately one year later, they resumed their relationship for an

---

[3] For ease of reading, the testimony is not summarized in the same order that it was presented at trial. Testimony that is irrelevant to the trial court's judgment and our review of that judgment has been omitted.

5.

additional four years. C.S. and L.S. were born during that time. They terminated their relationship permanently in 2021 and Father moved out of their shared residence. All three Children remained living with Mother.

{¶ 12} After he moved into his own residence, Father would have visitation with the Children every other weekend and sometimes during the week through an informal agreement between the parties. Father stated that his visits became sporadic as time went on until eventually Mother began demanding money before allowing him to visit.

{¶ 13} In the fall of 2021, Father began noticing his children suffering injuries. Specifically, he noted that C.S. and L.S. began showing up for his visits "covered in bruises." He stated that Mother was unable to account for the bruises. In November, 2021, when L.S. was 18 months old, he broke his left fibula. Father recalled that Mother said it had occurred when L.S. jumped off of the couch to accompany her to the kitchen to get food. Father questioned the accuracy of that statement. A short time later, Father noticed that L.S. had three bruises on his forehead. Father was told that L.S. fell off of the bed when he was left unattended while Mother took the other Children to school. A few days later, Mother informed Father that L.S. "wasn't feeling good." When Mother took L.S. to the pediatrician, the pediatrician ordered a CT scan of his head. The CT scan revealed a subdural hematoma—described as a "brain bleed"—that resulted in L.S. being admitted to the hospital. Father testified that during this period, he did not appear at each hospital visit because he trusted that Mother would provide the necessary updates. Mother did provide those updates to Father's satisfaction.

6.

{¶ 14} It was during L.S.'s admission to the hospital for the subdural hematoma that the Agency was made aware of the injuries. The Agency informed Father that they were going to investigate L.S.'s injury. The Agency immediately initiated a safety plan that placed the Children in Father's temporary custody. As the investigation concluded, Father sought legal custody of the Children through his emergency motion. He confirmed that he was granted emergency custody at the initial hearing and that Mother was granted visitation. At the time he was granted emergency custody, the Agency discontinued its investigation. Father attributed this to his informing the Agency that the trial court had granted his emergency motion.

{¶ 15} Father next described his time with the Children in the approximately 18 months since he had been granted emergency custody. He noted that L.S. was not "very social" before coming to live with him. Shortly after Father was granted emergency custody, L.S. began making friends and was not as shy.

{¶ 16} Father enrolled O.S. and C.S. in Norwalk city schools in Norwalk, Ohio when he was granted emergency custody. Father testified that C.S. received high scores on his progress reports at his new school and was now on an individual education plan ("IEP") and working with a speech therapist. C.S. had also received several individual awards for his academic and social success.

{¶ 17} O.S.'s report cards during the time spent with Father reflected that he struggles with math and reading but performs well in other subjects. Father met with O.S.'s teachers to develop strategies to help him succeed in all of his subjects. These efforts resulted in O.S.'s enrollment in a "504 plan" to encourage those strategies. Father

7.

helps with O.S.'s homework and studying. According to Father, L.S. was to begin attending preschool several months after the trial and had already been enrolled in an IEP to address his speech issues. Father identified copies of his Children's progress reports and letters informing him of C.S.'s awards as exhibits during his testimony.

{¶ 18} Outside of their educational record, Father also described the Children's social life and participation in extracurricular activities. He said that all three Children were making friends and interacting with them at parks and other public activities. The Children also participate in open gyms hosted at the local community center and C.S. and O.S. played in a youth baseball program.

{¶ 19} Overall, Father believed that the Children were succeeding both in school and in their social lives while in his custody. He worried that if Mother were to be granted custody that it would impact the Children's success as they would move to a different city and would not be able to attend Norwalk schools or community programming.

{¶ 20} While in Father's custody, the older two Children began attending counseling sessions that Father believed were helpful in dealing with emotional issues. At the time of the trial, the Children had been in counseling for nine months. Father had them attend counseling because he believed it would be helpful for them to "speak with somebody and open up about what's on their mind and what problems they may have[.]" He was concerned that they were having emotional issues since "something bad happened to their little brother" at Mother's house.

8.

{¶ 21} At the time of trial, Father and the Children were living in his residence with Fiancé. She and Father had been in a romantic relationship since October, 2021. The Children and Fiancé get along well. They call Fiancé "mom" and are excited to see her throughout the day. At one point, Fiancé wore a "mom" shirt referencing the Children's names and dates of birth to Father's baseball game on Mother's Day. Father believed this was appropriate because Fiancé "is a mother figure to [the Children]." He understood, however, that Mother may feel disrespected by the shirt.

{¶ 22} Father believed that he communicated well with Mother, albeit sometimes indirectly through Fiancé. He said that Fiancé helps "a lot" with the Children's care and will communicate with Mother on his behalf when he is unavailable. Father also noted that he and the Children see his mother, sisters, nieces, and nephews on a nearly daily basis and that they have a good relationship with his extended family.

{¶ 23} Turning to his employment and availability, Father testified that he had been employed with five different employers in the year prior to trial. He attributed these changes to layoff periods during the COVID-19 pandemic. Father's job at that time of trial was in construction. His schedule required him to work Monday through Friday but not on weekends. Generally, he leaves for work between 8:30 a.m. and 9:00 a.m., and returns home by 5:00 p.m. On days when his schedule allows, he returns from work earlier. While Father is at work, Fiancé takes C.S. and L.S. to counseling sessions or to their paternal grandmother's house for babysitting when Fiancé also has to work. When Father and Fiancé are not working, they take the Children to the park, go on walks, or play games at home.

9.

{¶ 24} Father is typically tasked with the Children's discipline. He said that he does not spank the children but corrects them by taking away electronics or having them write about the proper behavior. He denied that Fiancé had ever spanked the Children despite the GAL mentioning that as a concern in her report. Father explained that this concern was raised because L.S. once appeared with a mark on his backside. He explained that L.S. had fallen onto a plastic truck and that the incident was reported to Mother at the time it occurred.

{¶ 25} Father and Fiancé had recently reorganized their residence to accommodate the Children's needs. They converted their basement into a second living room to create additional play space for the Children. They also added rubber pads to all sharp corners, gates to all stairways, and a pad under L.S.'s bed in case he rolls off during the night. These safety precautions were added under the advice of the GAL.

{¶ 26} The GAL's report also indicated that Father had two prior felony convictions. Father acknowledged those convictions for theft and receiving stolen property in 2013 and 2016, respectively. He successfully completed a term of probation for each conviction.

{¶ 27} Father next addressed his concerns about Mother having custody of the Children. He recounted instances when they were still in a relationship together that Mother would contact him to come home because she "can't deal with [the Children] by herself," at one point demanding Father come home "before [she] threw them out the window." He also was concerned about Mother's choice in romantic partners who committed domestic violence against her, although he did not specify any certain

10.

individual. He also believed that Boyfriend abused the Children. For that reason, Father felt that Mother's residence was not a safe environment for the Children. Father was aware that Boyfriend and Mother were no longer in a relationship at the time of trial but did not know if Boyfriend, Roommate, and Roommate's Children had moved out of Mother's residence. Father also testified he had a video that showed his older Children and Roommate's Children abusing L.S. while unattended. He was not asked to describe the contents of the video and the video was not introduced into evidence at trial.

{¶ 28} Father next expressed concerns that Mother's schedule would have a negative impact on the Children if she were granted custody. He believed that Mother's work schedule, which occasionally took her out of town, would not allow the Children to regularly attend school or counseling and would be a disruption to their established routines.

{¶ 29} Regarding their compliance with their informal visitation schedule after separating, Father testified that Mother attempted to make changes to their agreed visitation schedules on short notice. Two of these instances were noted in the GAL's report.

{¶ 30} Father also described an incident in which L.S. was admitted to the hospital for a severe ear infection after the trial court had granted him emergency custody. Immediately following that incident, Mother filed her own motion for emergency custody, alleging that the hospitalization was the result of trauma. Father asserted that the motion was "denied for insufficient evidence," indicating that his residence remained a safe placement for the Children. Despite his concerns about Mother obtaining custody

11.

of the Children, Father acknowledged that Mother and the Children had a "good relationship."

{¶ 31} Father next described a GoFundMe account that Fiancé established after he was granted emergency custody. Father stated that when the page was initially set up, Fiancé included a narrative statement regarding the Children's relationship with Mother. Fiancé's statement specifically accused Mother and Boyfriend of abusing the Children and stated that Mother was unfit as a parent. At trial, Father acknowledged that these statements were made and that the personal attacks on Mother were disrespectful. He stated that it was inappropriate to make public statements about the situation but that he and Mother's relationship was now "better." He regretted that Fiancé posted those statements publicly.

{¶ 32} Father concluded his testimony reaffirming his belief that it was in the Children's best interest that they remain in his custody. He believed that he could satisfy the Children's needs and that granting custody to Mother would cause significant disruption to their lives. He conceded, however, that at the time of trial, Mother was a "good mother" to the Children.

### Testimony of Tanya Kraus

{¶ 33} Tanya Kraus is a social services specialist for Huron County Children and Family Services. In that role, Kraus is tasked with conducting investigations into abuse allegations. This includes conducting home visits and speaking with all family members and "any other collateral witnesses."

12.

{¶ 34} Kraus was assigned as the investigator to determine whether L.S. had been abused while in Father's custody in October, 2022. At that time, L.S. had been admitted to the hospital with a severe ear infection. Kraus conducted her investigation by meeting with Mother, Father, Fiancé, and the Children. She ultimately determined that the suspected abuse was unsubstantiated, meaning that "no trauma happened in this case."

{¶ 35} As part of her testimony, Kraus was asked to recount her home visit with Father and the Children. She testified that there was a bond between Father, the Children, and Fiancé. She was unable to provide any thoughts regarding Mother's relationship with the Children because they were not present when she interviewed Mother during her investigation.

### Testimony of Julia Parker

{¶ 36} At the time of trial, Julia Parker was an intern at a counseling center in Norwalk, Ohio. Her work as an intern was supervised by a licensed counselor as part of her training to become a licensed counselor. She had already earned a bachelor's degree in allied health and psychology and expected to take the National Counsel Exam at the conclusion of her training.

{¶ 37} Parker began counseling O.S. and C.S. in December, 2022, and L.S. in March, 2023. The counseling sessions took place weekly. She described the Children's attendance as "consistent." At no point during their sessions had the Children raised any concerns regarding their safety while in Father's custody or during visits with Mother.

13.

## Testimony of Milagros Marrero

{¶ 38} Milagros Marrero is an intake worker with the Agency. In that position, she investigates and attempts to "alleviate" abuse and neglect of children. She was serving in that capacity at all times relevant to the present case.

{¶ 39} She first became involved in the investigation of abuse of the Children in 2021. Her agency was initially informed that L.S. had marks and bruises on him following his first emergency room visit. "A week or two later," the Agency was advised that L.S. had been admitted to the hospital. Marrero was assigned to conduct an investigation of the alleged abuse. She immediately placed the Children with father under a stipulated safety plan. Marrero testified that the investigation took several weeks and included assessments from medical professionals. She ultimately determined that allegations Mother had abused L.S. were unsubstantiated. She forwarded a letter to Mother on January 31, 2022 informing her of the result of the investigation. The Agency closed the case against Mother as a result of that conclusion. Marrero refuted Father's statement that the investigation was closed as a result of the trial court granting him emergency custody of the Children. Marrero noted that a separate letter was sent to Roommate stating the Agency's conclusion indicated that Roommate had abused L.S. Marrero confirmed that Roommate left Mother's residence after receiving the letter. Boyfriend still lived with Mother at the time the investigation ended.

## Testimony of Grandmother

{¶ 40} Grandmother is the Children's maternal grandmother. She served as the supervisor for Mother's visitation with the Children in 2022. Grandmother believed that

14.

her supervision was unnecessary, despite being court-ordered, because Mother had a "very loving" relationship with the Children. Grandmother never observed Mother acting in an unsafe manner with the Children. She testified that Mother is always attentive with the Children and she has no concerns with Mother's abilities as a parent.

{¶ 41} Grandmother then described her own relationship with Father. She stated that she had known Father for approximately 10 years. At the time of trial, she no longer had a relationship with Father. She also noted that while Mother attempted to have regular communication with Father, Father either would not respond, offer "very short" responses, or would have Fiancé respond on his behalf. She recounted a prior incident in which she, in her role supervising Mother's visits, went to pick up the older two Children while L.S. was in the hospital with an ear infection. Fiancé refused to allow Mother to take the Children, despite it being a scheduled visit, and ordered Grandmother and Mother off her property. Mother left and did not complete her scheduled visit that day. Father also delayed Mother's visit the following weekend. Mother was eventually able to have her visit with the Children but that visit was later than the appointed time.

### Testimony of Mother

{¶ 42} Mother began her testimony describing her living situation beginning in October 2021. At that time, she lived with the Children, Boyfriend, Roommate, and Roommate's Children. She attributed this arrangement to her inability to maintain her own residence after Father moved out. She reached an agreement where she would stay home with the Children and Roommate, who had recently been diagnosed with dementia, during the day. Then, Boyfriend would watch the Children while Mother worked in the

15.

evenings.  Roommate moved out of the residence in December of [2021].[4]  Mother continued living with Boyfriend until September, 2022 when she moved into her own residence.  When the Children are present at this new residence, O.S. has his own bedroom and C.S. and L.S. share a bedroom.

{¶ 43} At the time the trial court granted Father emergency custody in January, 2022, Mother was granted six hours of supervised visitation with the Children every Saturday.  That schedule was amended several months later to allow Mother to have supervised, overnight visitation with the Children every other weekend.  The supervision requirement was lifted in December, 2022, and the parties have remained on that visitation schedule since that time.

{¶ 44} Mother believes that the schedule does not afford her enough time with the Children and that it "confuses" the Children by allowing just enough time to get used to her routines before they return to Father.  She recounted that she was denied her visitation while L.S. was in the hospital with an ear infection in 2022.  At that time, Mother informed Father that she was leaving the hospital to pick up the two older Children. When she arrived at Father's residence, Fiancé told her she could not take the Children and to get off her property.  Mother reported this incident to the local police department but said that they declined to help since it was a "civil matter."  Mother did not receive her scheduled visitation that day.  She also described a delay in her visitation the

---

[4] Mother identified the date Roommate moved out as 2022.  However, all other evidence presented in this case shows that this event occurred in 2021.  We clarify Mother's testimony to avoid confusion.

16.

following weekend when Father informed her that the Children did not want to go with her and that he would not force them to do so. Mother was eventually able to pick up the Children several hours later. She testified that she had never denied returning Children to Father at the conclusion of her visits. She also stated that she has attempted to negotiate additional regular visitation but has been unsuccessful.

{¶ 45} Prior to Father obtaining emergency custody, the Children primarily lived with Mother. Mother and Father had an informal arrangement in which Father would visit with the Children and speak with them on the phone. Father would also take care of the Children when Mother had to work and could not make other arrangements. She disputed Father's testimony that she was keeping Father from the Children during this time. Mother considered herself the primary caregiver as she scheduled the Children's appointments, organized their activities, and communicated with the school on their behalf. She also was primarily responsible for preparing the Children's meals and maintaining their personal hygiene. According to Mother, Father was not involved with any of these caregiving activities.

{¶ 46} Mother next recalled the Agency's first involvement with the abuse allegations in November, 2021. She noted that her employment at the time allowed her to be home during the day. She was at home with C.S. and L.S. while O.S. was at school. C.S. requested a snack and when she got up to go prepare it, L.S. attempted to follow her. In doing so, he twisted his ankle and fell off the couch. She immediately took him to the emergency room where he was diagnosed with a fractured tibia. He was placed in a full-leg cast. Mother immediately contacted Father to advise him of the accident.

17.

{¶ 47} On December 7, 2021, L.S. again suffered an injury when he fell off a bed onto a hard floor. Mother noted that his top teeth damaged his lip in the fall. She again took him to the emergency room. She was advised that the cut would heal and that stitches were unnecessary. She notified Father of the incident.

{¶ 48} Upon returning home, Mother noticed that L.S. "wasn't right." She stated that he was "very sleepy" and declined to play. She took him to his pediatrician who referred her to a local hospital. At the hospital, L.S. was diagnosed with a subdural hematoma and admitted. Father came to the hospital the following day. The Agency was advised of this admission and opened an investigation to determine whether Mother, Boyfriend, or Roommate—all adults living in the residence—had abused L.S. Mother testified that she was interviewed by an Agency representative and a local police officer. The Agency requested, and Mother agreed, to enter into a safety plan in which the Children would be placed in Father's custody while the investigation took place. The investigation found that any abuse allegations against Mother and Boyfriend were unsubstantiated. The investigation did conclude that Roommate's abuse of the Children was "indicated." Mother believed that Roommate was not charged with a criminal offense because she suffered from dementia. Roommate moved out of Mother's residence before Christmas, 2021, and has had no further contact with Mother or the Children.

{¶ 49} The safety plan Mother agreed to at the beginning of the investigation was terminated on January 10, 2022. The Agency contacted Mother and informed her that she could go pick up the Children. At that time, Mother was unaware that Father had

18.

filed his complaint and motion for emergency custody. Mother testified that the basis for the safety plan, Roommate's presence in the home, had been resolved at that time, thereby, in her opinion, resolving all issues identified in Father's motion for emergency custody.

{¶ 50} Since Father was awarded emergency custody, the Children have had no emergency situations during their visits with Mother. She stated that the Children are always excited for their visits with her and that she is "very present" during those times.

{¶ 51} At the time of trial, Mother was employed in a residential home that offers services for individuals with intellectual and developmental disabilities. She had served as the house manager and a "qualified intellectual disability professional" since July, 2022. She described her schedule in that role as "flexible" in that she works as needed but can also maintain a "home-life balance." She does not work weekends and her typical work week consists of 40 hours. She does have to attend an annual four-day conference out of town. At the time of trial, she was being compensated at an annual rate of $58,000. She was also working on completing a master's degree in psychology. Upon obtaining that degree, she expects to move into a consulting role that will result in an increase in her annual income. Mother did not identify any concerns with expenses but did acknowledge that she previously had to enter into an alternate payment plan to avoid repossession of her vehicle approximately two months before trial. She attributed her delinquent payments to having to spend money on attorney's fees related to this matter.

{¶ 52} Mother next described her family and community life. She testified that her mother, father, brothers, sister, and a brother-in-law live "in the area." She has a

19.

close relationship with her family. She is not currently in a romantic relationship. She and Boyfriend separated in the fall of 2022 and she has not had any contact with him since that time. She planned to enroll the Children in community activities including baseball and t-ball if she were to be granted custody.

{¶ 53} Mother confirmed that she and Father had agreed to additional visitation for the then-upcoming summer. Mother testified that since the Children would be with her for longer durations that she would need to engage third-party care for the Children during some of their time with her. She plans to utilize family members for that purpose and stated that the Children are comfortable with those family members. She also testified that she wished to communicate with Father more regularly on issues involving the Children but that he is generally non-responsive and that she only receives responses from Fiancé. Mother believes that Fiancé is the Children's primary caregiver when they are with Father. She was concerned that if Father and Fiancé were to separate, Father would not be able to care for the Children on his own. She acknowledged that Father is "a good dad" but she believes he is not as "present" as he should be with the Children due to his focus on his own hobbies.

{¶ 54} Mother identified several concerns that she had with Fiancé in the year prior to the trial. She first discussed the GoFundMe page that she found insulting. Mother confronted Father and Fiancé about the statements made therein and the site was eventually removed. Mother also recounted seeing Fiancé wearing a "mom established" shirt referencing the Children when she dropped them off at Father's baseball game on Mother's Day. Mother was upset by the shirt because she believes it creates confusion

20.

about her own role in the Children's lives and makes her feel uncomfortable as she believes she should have custody of the Children.

{¶ 55} Following the granting of emergency custody to Father, the Children were enrolled in the Norwalk, Ohio school system. Father did not inform Mother that he was changing the Children's enrollment upon obtaining emergency custody. Mother stated that this transition has been difficult as O.S. had been struggling at school. She has not had any communication from the school regarding these perceived issues. Recognizing the number of O.S.'s absences, Mother stated that absences had never been an issue when she had custody of the Children. Despite her requests, the school initially would not provide her with any information about her Children because she was not listed on their contact information. On April 25, 2023, the trial court provided Mother with an order stating that she could have access to the Children's school records despite the ongoing custody dispute. If Mother were to regain custody of the Children, she intended to transfer them to Elyria local schools where she now resides. Mother has a nephew that attends the same school and she believes he would be a positive influence for O.S.

{¶ 56} While Mother does not believe that Father is unsuitable as a parent, she testified that she has concerns about the Children remaining in his custody. For example, she does not believe Father addresses their hygiene appropriately. When the Children come to visit her, she often has to bathe them and change them into fresh clothing. She also believes that Father is not consistent with L.S.'s potty-training. Mother stated that it is in the Children's best interest to spend the majority of their time with her and only with

21.

Father for visitation. She believes that she is more capable of meeting the Children's needs and providing the care and support necessary to maintain their well-being.

## Testimony of Janene Murphy, GAL

{¶ 57} Janene Murphy is the guardian ad litem assigned to represent the Children's interests in this matter. At trial, the parties stipulated to allow Murphy to provide a summary of her report before being subject to examination.

{¶ 58} Murphy stated that she interviewed Mother at her residence in July, 2022. At that time, Mother was living with Boyfriend. Murphy described Mother as upset and overwhelmed following the loss of custody of the Children and her interaction with the legal process in trying to regain custody. She found Mother to be cooperative and noted that Mother provided her with all records she had related to the dispute. After again observing the Children with Mother several weeks later, Murphy determined that the Children and Mother had a good relationship. Mother spent a significant portion of that visit playing with the Children so was unable to engage in significant discussions with Murphy.

{¶ 59} When Murphy next engaged with Mother, she found out that Mother had left a restaurant job and obtained professional employment at residential home that offers services for individuals with intellectual and developmental disabilities. The increased compensation at this job allowed Mother to obtain her current housing. Murphy noted that the new position required Mother to take care of others with special needs, showing that she would be capable of caring for the Children.

22.

{¶ 60} Several weeks after first meeting with Mother, Murphy met with Father, Fiancé, and the Children at Father's residence. She identified safety concerns at Father's residence, such as sharp edges and corners, that she wanted Father to alleviate. During her visit, Murphy found the Children to be highly active. Murphy found that O.S. appeared to consider himself a "caretaker" for his younger siblings. While noting that she was not a medical professional, she attributed his desire to serve in this role because of Mother and Father's separation.

{¶ 61} Overall, Murphy believed that both parents had their Children's best interests in mind. She also believed that Mother, Father, and the Children would benefit from better communication between the parents. She understood Father's limitation in communicating during the day while he was working, resulting in Fiancé handling the majority of the communications with Mother. Nevertheless, she believed that Mother and Father should make opportunities to communicate. She believed that additional communication would eliminate issues regarding holiday visitation and scheduling.

{¶ 62} Generally, Murphy described her observations as showing "two parents who love their children" and that they "both want to spend as much time with their children as they can." Murphy concluded that both parents could provide the Children with a safe and loving home. Murphy ultimately concluded that Mother should be granted custody of the Children. This conclusion was based on her observation that Mother had been the primary caregiver before their separation, that Father delegated "a lot" of the Children's care to Fiancé, and that Mother's work to change her life to provide better care for the Children warranted giving her that opportunity on a full-time basis.

23.

Murphy recommended that whatever decision the trial court reached that Mother and Father should engage in high-conflict parenting communication classes and to work together to improve their Children's lives.

{¶ 63} During Father's cross-examination, Murphy confirmed that during her interview with the Children, O.S. stated that he felt safer with Father. In response, Murphy stated that while she did not disregard this comment in her evaluation, she attributed the statement to O.S. wanting to say what he believed Father wanted to hear rather than to raise a serious concern about his time with Mother. She conceded that O.S. never made a reciprocal comment regarding feeling safer with Mother.

{¶ 64} Murphy then described her review of the video Father mentioned during his testimony. She stated that the video was taken at Mother's house and reflected the Children, along with Roommate's Children, engaged in a game where the older children were jumping on L.S. Murphy estimated that L.S. was two years old at the time of the video. Murphy described the situation as "chaos" and declined to watch the entire video because it made her "uncomfortable." She recalled that Mother remained in a relationship with Boyfriend for nine months after the incident depicted in the video occurred. Addressing the impact of the video on her recommendation, she stated that "[s]ometimes good decisions are hard to make" but gave Mother credit for ultimately deciding to terminate her relationship with Boyfriend when she believed it might impact her regaining custody of the Children.

24.

{¶ 65} Murphy next restated that it was her recommendation that Mother be granted custody and that none of the testimony she heard at trial would change that recommendation.

{¶ 66} During Mother's cross-examination, Murphy confirmed the contents of her report were true and accurate regarding her observations and recommendation that Mother be granted custody of the Children. She testified that her recommendation had become "more concrete" during the trial. Her concern with Father maintaining custody of the Children was primarily with Fiancé taking on a maternal role. Murphy believed that if this continued it would alienate the Children from Mother.

{¶ 67} Regarding the video she reviewed, Murphy did not believe that the aggression toward L.S. was malicious. Instead, she found it to be mere "roughhousing" and that one of Roommate's Children, the oldest and largest of the children involved, was simply unaware that he might harm L.S. Mother's cross-examination of Murphy concluded with her testimony that she believed it was in the Children's best interest that Mother be granted custody.

## Judgment

{¶ 68} At the conclusion of Muphy's testimony, the trial court took the matter under advisement. It outlined the process through which it would reach its conclusion, including references to the statute that guided that decision, and informed the parties that it would provide its judgment in a reasonable time.

25.

{¶ 69} The trial court rendered its judgment on August 7, 2023. It held, pursuant to R.C. 3109.04(B)(1), that it was in the Children's best interest that Father be granted legal custody of the Children.

### B. Assignments of Error

{¶ 70} Mother timely appealed and asserts the following errors for our review:

1. The trial court abused its discretion in awarding custody of [the Children] to [Father].

2. The trial court's decision was against the manifest weight of the evidence.

Because it informs our review of Mother's first assignment of error, we address Mother's second assignment of error first.

### II. Law and Analysis

{¶ 71} In her second assignment of error, Mother alleges that the trial court's decision granting custody of the Children to Father is against the manifest weight of the evidence. "Legal custody proceedings vest in the custodian the right to have physical care and control of the child, subject to any residual rights and responsibilities that remain intact with the birth parents." *In re. H.H.,* 2024-Ohio-686, ¶ 64 (6th Dist.). "Because custody determinations are 'some of the most difficult and agonizing decisions a trial court must make,' a trial court judge must have broad discretion in considering all of the evidence." *Id.,* citing *Davis v. Flickinger,* 77 Ohio St.3d 415, 418 (1997). "Therefore, an award of legal custody will not be reversed on appeal *absent an abuse of discretion.*" *Id.* (emphasis added).

26.

**{¶ 72}** For these reasons, we find that our review of the trial court's granting of Father's motion for legal custody is for an abuse of the trial court's discretion and not, as Mother suggests, whether that decision is against the manifest weight of the evidence. Because Mother's second assignment of error seeks review that this court cannot conduct as a matter of law, we find Mother's second assignment of error not well-taken.

**{¶ 73}** In her first assignment of error, Mother argues that the trial court abused its discretion in granting Father custody of the Children. As described above, we review the trial court's grant of legal custody of the Children to Father for an abuse of discretion. *Id.* "To constitute an abuse of discretion, the ruling must be unreasonable, arbitrary, or unconscionable." *Id.* at ¶ 66.

**{¶ 74}** The trial court's broad discretion in awarding legal custody "must be guided by the language set forth in R.C. 3109.04." *In re. D.T.,* 2023-Ohio-2245, ¶ 45 (6th Dist.), citing *Miller v. Miller,* 37 Ohio St.3d 71 (1988). To determine the allocation of parental rights and responsibilities, "the court shall take into account that which would be in the best interest of the children." *In re. J.S.,* 2021-Ohio-1678, ¶ 36 (6th Dist.). R.C. 3109.04(B)(1) states:

> In determining the best interest of a child * * * the court shall consider all relevant factors including, but not limited to:
>
> (a) The wishes of the child's parents regarding the child's care;
>
> (b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

27.

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state[.]

R.C. 3109.04(F).

**{¶ 75}** The trial court's judgment entry expressly notes its consideration of each of these best interest factors. A summary of the trial court's findings follows:

*R.C. 3109.04(F)(1)(a) – Parent's wishes*
As to the parent's wishes factor, the trial court noted that both parents expressed a desire to be designated the Children's primary legal guardian. The record plainly supports this conclusion.

*R.C. 3109.04(F)(1)(b) – The Children's wishes*
After speaking with O.S.—the oldest of the Children—in camera, the trial court concluded that O.S. was too young to offer an informed decision concerning his custodial status. The trial court recognized that the GAL's report recommended Mother be granted custody of the Children. The trial court noted, however, that the GAL's report found that the Children were "safe and cared for in Father's custody." The trial court found that the Children's desire factor, to the extent that it was expressed through the GAL's advocacy, was not in the Children's best interest due to the disruption of their lives that would occur should Mother be granted custody. This included the Children changing schools, changing counselors, and finding a new group of friends.

*R.C. 3109.04(F)(1)(c) – The Children's interaction with family*
Next, the trial court found that "[a]ll three children are well integrated and comfortable with their parents' respective homes." This conclusion was based on the evidence presented showing that the Children had good relationships with both parents and their parents' extended family members.

*R.C. 3109.04(F)(1)(d) – The Children's adjustment to home and community*
The trial court weighed this fourth factor in favor of finding that it was in the Children's best interest that Father be awarded custody. The trial court noted the Children's involvement in school and community activities while they have been in Father's emergency custody. The trial court also recognized that Father had taken steps to obtain special education services "to address [the Children's] individual needs." The trial court found that Mother had not presented evidence of the Children's integration into the community when they lived with her prior to Father obtaining emergency custody. The trial court also found that Mother chose to live in an unsafe environment with Boyfriend, Roommate, and Roommate's Children, further interfering with the Children's adjustment to her home.

*R.C. 3109.04(F)(1)(e) – The parents' mental and physical health*

The trial court found that Father was in good mental and physical health. The trial court also noted that Mother suffers from, and is treated for, depression. Despite recognizing Mother's diagnosis, the trial court made no statement as to whether this factor weighed in favor of Mother or Father in determining the Children's best interests.

*R.C. 3109.04(F)(1)(f) and (i) – Compliance with court orders*
At trial, Father alleged that Mother denied him visitation under their informal agreement after their separation. Additionally, Father, through Fiancé, denied Mother visitation with the Children on at least one occasion after Father was awarded emergency custody. Based on this evidence, the trial court determined that "[e]ach parent is equally likely to honor parenting times[.]"

*R.C. 3109.04(F)(1)(g) – Compliance with child support orders*
Only Father had been ordered to pay child support at any time during this dispute. The trial court found that there was no evidence presented at trial to show that Father was ever in arrears as to those payments. The trial court found that "both parties supported their children while they were residing with each other." The trial court did not expressly state how this factor affected its best interest determination.

*R.C. 3109.04(F)(1)(h) – Parent's criminal background*
Without commentary, the trial court recognized that Father had a criminal background that included theft offenses. No evidence was presented to show that Mother had a criminal background.

*R.C. 3109.04(F)(1)(j) – Out of state residence*
The trial court noted that there was no evidence presented at trial to show that either party intended to move out of state.

{¶ 76} In addition to the factors expressly identified in the statute, the trial court also considered other relevant factors regarding what was in the Children's best interest pursuant to R.C. 3109.04(F)(1). The trial court noted that its decision was "difficult" because "both parents are appropriate to be granted custody." However, it found that Father had established a larger family network and had enrolled the Children in educational and counseling services while in his emergency custody. Mother did not take

30.

these steps while the Children had been in her custody. The trial court also found that while Mother was the primary caregiver when the Children had been in her custody, that during that time, Mother chose to live with Boyfriend, Roommate, and Roommate's Children, a choice the trial court weighed against granting custody to Mother. While Mother's contact with Boyfriend and Roommate had ended, the trial court found it relevant that Mother only chose to end that contact when "forced" to do so by the Agency.

{¶ 77} Regarding Father's reliance on Fiancé as the primary caregiver while in his custody, the trial court recognized that this reliance is primarily based on Father's work schedule. The trial court found that the evidence showed that if Mother were to be granted custody, she would also need someone to provide care for the Children as her and Father's work hours were "about the same[.]" For this reason, the trial court found that Father's reliance on Fiancé was not a detriment to his case for custody but instead determined that because Fiancé lived with Father, her serving as the role of caregiver was a benefit to the Children. The trial court also recognized that Mother lives alone and would always require help from outside the home to care for the Children during work hours. Put simply, the trial court found that Fiancé's availability to serve as the Children's caregiver was helpful to the Children and weighed in favor of granting custody to Father.

{¶ 78} The trial court did, however, note concern over Father having recognized Fiancé on the previous Mother's Day but not having the Children recognize Mother in any way. The trial court found that this was a communication issue that would be

31.

properly addressed through the trial court's orders rather than a factor that impacted its custody determination. Indeed, the trial court's order reflected a visitation schedule in which the Children would always spend Mother's Day with Mother, regardless of whether Mother was entitled to visitation on that day.

{¶ 79} Upon considering all of these factors, the trial court ultimately determined that it was in the Children's best interest to be placed in Father's custody as the primary residential parent.

{¶ 80} On appeal, Mother argues that the trial court's decision constitutes an abuse of discretion. Specifically, she argues that the trial court incorrectly weighed the factors described in R.C. 3109.04(F)(1)(c), (d), and (f) against her. Further, she argues that her role as the Children's primary caregiver prior to and after the parties' separation should have weighed in her favor in determining legal custody. Mother argues that because these factors weighed in her favor that the trial court abused its discretion in granting Father legal custody of the Children. We disagree.

{¶ 81} When considering each of the enumerated factors, the trial court identified the precise evidence on which it weighed those factors. As to the Children's interaction with family (R.C. 3109.04(F)(1)(c)), the trial court found that the Children had bonded with Father and his family members from the time that he was granted emergency custody. The trial court also noted that the Children had a strong relationship with Mother and their maternal grandmother. The trial court did not make an express finding as to whether this factor weighed in Father or Mother's favor in assessing what was in the Children's best interest.

32.

{¶ 82} Having reviewed the record, we find that the trial court's conclusions as to the Children's relationship with both parents and their family members is supported by the evidence. All evidence shows, as recognized by appellant in her brief, that the Children "are lucky to have as many individuals around them that care for them as they do." The trial court recognized this fact in its judgment entry by finding that the Children had a strong relationship with all of those individuals. Mother's argument that the trial court "discounted" some of the Children's relationships with her extended family is simply not supported by the record or the trial court's judgment entry.

{¶ 83} When considering the Children's adjustment to their homes, school, and community (R.C. 3109.04(F)(1)(d)), the trial court described all of the efforts Father took to engage the Children in school and community activities. It also recounted Father's efforts to obtain special education services from their school. Conversely, the trial court noted that while Mother had previously provided the Children's primary care, Mother had not sought special education services or enrolled the Children in community activities. The record supports the trial court's conclusion as Mother only enrolled the Children in community activities for a brief period and never sought to enroll them in education services.

{¶ 84} Finally, as to which parent would be more likely to honor court orders (R.C. 3109.04(F)(1)(f)), the trial court noted that both parents alleged that the other had denied them visitation. With competing arguments that each parent had previously denied the other parent visitation, we cannot say that the trial court's determination that both parents were equally likely to abide by the terms of its judgment was incorrect or

33.

that this factor should have weighed more heavily in Mother's favor. Further, we find that Mother's argument that the trial court should have considered Fiancé's alleged attempts to "replace" Mother under this factor is misplaced. Fiancé's refusal to grant Mother her visitation in 2022 is indeed one of the incidents the trial court considered when it reached its conclusion. Mother cannot say that the trial court did not consider Fiancé's actions when reviewing this factor. Additionally, while it is understandable that Mother might object to Fiancé serving as a caregiver for the Children, the trial court did consider Fiancé's significant role as a caregiver but found that it benefitted the Children as described above. This, coupled with the trial court's conclusion that the Children had adjusted well to Fiancé while living with Father, shows that Mother's argument that trial court did not consider Fiancé's role in the Children's lives when reviewing this factor is unfounded.

{¶ 85} Having reviewed the record, we find that the trial court accurately recounts the evidence that the parties introduced at trial. Further, we find that the trial court's judgment entry offers a thorough and thoughtful consideration of that evidence when determining the best interests of the Children. Unsurprisingly, Mother disagrees with the trial court's decision. She fails, however, to identify any portion of the record that shows that the trial court's decision was unreasonable, arbitrary, or unconscionable.

{¶ 86} In sum, this "close" decision was merely one of the "difficult and agonizing" decisions related to child custody on which we must afford the trial court broad discretion. *H.H.* at ¶ 64. While Mother identifies evidence that she believes weighed in her favor, we cannot say that the trial court's careful consideration of all the

34.

relevant factors in granting Father's motion was arbitrary, unreasonable, or unconscionable. As a result, the trial court did not abuse its discretion in granting legal custody of the Children to Father and we find Mother's second assignment of error not well-taken.

### III. Conclusion

{¶ 87} For the foregoing reasons, we find Mother's first and second assignments of error not well-taken. Therefore, we affirm the August 7, 2023 judgments of the Erie County Court of Common Pleas, Juvenile Division.

{¶ 88} Mother is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.

_____
JUDGE

Myron C. Duhart, J.

_____

Charles E. Sulek, P.J.                          JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.