**[Cite as *In re R.H.*, 2025-Ohio-1377.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

In re R.H., R.S.

Court of Appeals No.  OT-24-024
OT-24-037

Trial Court No.  2023 JUV 075
2023 JUV 076

**<u>DECISION AND JUDGMENT</u>**

Decided:  April 17, 2025

* * * * *

Christopher N. Enoch, for appellee.

James E. Haughn, for appellant.

* * * * *

**SULEK, P.J.**

**{¶ 1}** In this consolidated appeal, appellant-mother, L.H., appeals from a judgment of the Ottawa County Common Pleas Court, Juvenile Division, denying her motion for legal custody of her children R.H. and R.S., and instead granting the Ottawa County Department of Job and Family Services' ("the agency") motion to award legal custody of the children to their maternal grandmother, A.S.  For the following reasons, the juvenile court's judgment is affirmed.

# I. Facts and Procedural History

{¶ 2} L.H. is the mother of R.H., born May 2019, and R.S., born October 2021. D.S. is the children's father. On February 27, 2023, the agency requested emergency temporary custody of the children due to safety concerns. An attached affidavit claimed that on February 13, 2023, mother went for an assessment and told the interviewer that she has attempted to choke her children when irritated. She also told the interviewer that she killed her pet birds due to their chirping.

{¶ 3} The next day, an agency caseworker conducted an unannounced home visit with mother and R.S. (R.H. was visiting father). Mother stated that her anxiety and ADHD cause her to be very disorganized and anxious about being alone with the children and being in public. She admitted she accidentally killed her bird while disciplining it. She denied ever harming her children but admitted that when she gets upset, she "thinks" about choking them. Mother agreed to accompany the caseworker to the children's grandmother's home where they would stay until her mental health stabilized.

{¶ 4} Maternal grandmother and mother signed a safety plan providing that grandmother would keep the children safe and that mother would not be left unsupervised with them. On February 25, 2023, the agency learned that mother absconded with the children during the night and they could not be located.

{¶ 5} On February 27, 2023 the court granted the agency's motion for emergency temporary custody. The next day, the agency filed a complaint alleging that R.H. and R.S. were abused and dependent children and were currently in the custody of Duval County Child Protective Services in Jacksonville, Florida. By agreement of the parties,

2.

the agency amended its complaint by removing the abuse allegation. On March 28, 2023, mother and father admitted the dependency violation and the juvenile court adjudicated R.H. and R.S. dependent children.

{¶ 6} The initial case plan with a reunification goal provided that mother complete a mental health assessment, be honest and forthcoming during the assessment, and follow through with all recommendations. The plan also provided she complete a parenting program, attend all scheduled visits, maintain sobriety and submit to random drug screens, maintain safe and stable housing and financial stability, and sign all necessary releases for the agency.

{¶ 7} On June 1, 2023, father moved for legal custody of the children. He stated that he had adequate employment, is able to care for the children, and has recently provided much of their care due to mother's "disability."

{¶ 8} Maternal grandmother moved for legal custody on August 28, 2023, stating that she has acted in "loco parentis" regarding the children's care since their respective births. She made various claims relating to the parents' inability to properly care for the children.

{¶ 9} The agency also moved to have legal custody awarded to maternal grandmother, claiming that it would be in the children's best interests as they have been in grandmother's care since March 2023, and are safe and all their needs are met. The motion noted mother's lack of compliance with the mental health provisions of the case plan, her violation of the prior safety plan and her pending criminal matters, and father's struggles with chemical dependency and lack of suitable housing. Grandmother

3.

subsequently dismissed her legal custody motion stating that based on the agency's motion it was duplicative and moot.

{¶ 10} On February 23, 2024, mother moved for legal custody. She stated that she was regularly attending therapy and her mental health has improved, she completed parenting classes, and she is employed.

{¶ 11} The GAL filed his report on April 2, 2024. At the April 9, 2024, dispositional hearing on the motions for legal custody, the GAL testified that his interactions with mother have changed over time. Mother initially failed to appreciate her mental health issues and could not grasp why she could not have her children; she now is engaged in counseling, compliant with her medications, and more "on top of life."

{¶ 12} The GAL acknowledged that although mother had been found incompetent in a pending criminal matter; she had since been found competent. The GAL testified that mother had pending felony and misdemeanor cases and has applied for diversion for the felony.

{¶ 13} The GAL agreed that it would have been helpful to review mother's mental health records. He stated that 99 per cent of the time the records are available as part of discovery. The GAL stated that mother is employed and shares a small home with a roommate who was "pleasant" upon meeting. It is currently a one-bedroom but there are two small bedrooms under construction. The home is clean and "acceptable."

{¶ 14} Overall, the GAL believed that mother is not ready for full-time parenting. He felt that mother still needs to work on her mental health issues. She also needed to work on her relationship with her mother, the children's grandmother.

4.

{¶ 15} Mother is currently limited to supervised visitation with the children. She has chosen not to participate in visits anymore because it is not a "natural" situation. During the time she attended visitation, there were no reports of any inappropriate behaviors. The GAL would have liked to see mother continue with the visits.

{¶ 16} Regarding father, the GAL testified that approximately two days per week he has unsupervised, overnight visits with the children at his home. Father works a lot limiting his time to be with his children. The GAL testified that father uses marijuana for back pain and, likely, recreationally. Though father states that he does not smoke around the children, they have been reported to smell like smoke. The GAL thought that father smoked outside or sitting in a "disabled" vehicle; the house does not smell like smoke.

{¶ 17} The GAL testified that father lives in a nicely converted garage. It has one bedroom with what looks like another bedroom under construction. The GAL stated that it was not a long-term solution because the children are mix-gendered. Father would ultimately like to move into the house at the front of the property; a tenant currently resides there.

{¶ 18} The GAL testified that based on these factors, father is not currently equipped to be a full-time parent. He clarified that the term encompasses the ability to immediately meet the needs of a child or have the ability to arrange to have the needs met.

{¶ 19} As to maternal grandmother, the GAL testified that she and her husband have been the children's primary caregivers for most of their lives. They enrolled R.H. in preschool, arrange and take the children to all medical and dental appointments, and they

5.

provide seasonably appropriate clothing. The GAL expressed no concerns about either the safety or suitability of maternal grandparents' home.

{¶ 20} The GAL testified that even though they are young, he believes that the children have bonded with mother, father, and maternal grandmother. In his opinion, the children's best interests is to remain with maternal grandmother with visitation with father and supervised visitation with mother.

{¶ 21} Mother's counsel cross-examined the GAL regarding her mental health, employment, and housing. The GAL agreed that he has seen positive changes in mother's ability to engage in conversations. He agreed that mother is currently employed and has consistently been working, though at a few different jobs, during the proceedings. Mother also has housing, but the GAL expressed concerns because she is not on the lease and the children's rooms were still under construction.

{¶ 22} Maternal grandmother testified that the children were initially placed with father following disposition but that she had the children the majority of the time. They were officially placed in her full-time care after mother's monitor pinged from father's apartment. Father currently has the children from Thursday evening until Saturday afternoon.

{¶ 23} Grandmother testified that R.H. has her own room in her home and that R.S. has a bed in another room. She stated that the children's medical and dental needs have been addressed. To her knowledge, R.S. had never been to a doctor; she took him and got him up to date on his immunizations. He was also diagnosed with a speech delay

6.

which is being addressed. R.H. had "extensive" oral surgery. The children's medical records were admitted into evidence.

{¶ 24} Grandmother testified that during the week, the children get up between 6:30 to 7:00 a.m., get dressed, have breakfast, and get dropped off at daycare. R.H. gets picked up from daycare by a school bus, taken to preschool, and dropped off at grandmother's house at approximately 3:45 p.m. R.S. is picked up from daycare at 3:30 p.m.

{¶ 25} Grandmother believes that it is in the children's best interests to remain with her and her husband. She does not feel that mother is stable enough to have the children.

{¶ 26} During cross-examination, grandmother agreed that the current visitation schedule with father was going well. Drop offs and pick-ups are smooth and the parties communicate well. Grandmother stated that she was willing to supervise visits with mother in public. She stated that supervised visitation in her home was not an option until she and mother rebuilt trust. Grandmother testified that in the past three months their relationship has improved.

{¶ 27} The family's caseworker testified that her involvement in the case began when she and another caseworker retrieved the children from Florida after mother violated the safety plan. The agency's initial concerns included mother's mental health, domestic violence, and the children's safety.

{¶ 28} Reviewing the family's case plan, the caseworker testified that she and father met monthly, that he completed parenting class but had been inconsistent with

7.

visitation. The children were initially placed with father but then placed in grandmother's custody after he indicated that she would still provide the majority of their care. There were also concerns that father allowed mother access to the children.

{¶ 29} As to father's sobriety, the caseworker testified that he tested positive for marijuana but got his medical marijuana card in September 2023. Father told the caseworker that he had a prior narcotic addiction following a back injury; he followed all recommendations at the Suboxone clinic.

{¶ 30} Father has a one-bedroom apartment and is financially stable. The caseworker testified that father has not provided any financial support for his children. On one occasion, he gave grandmother $200, but only after being prompted by the caseworker.

{¶ 31} The caseworker testified that mother "pushes back a lot" and failed to inform her of her frequently changing address. The caseworker stated that she tried to get mental health records relating to mother's counseling but even though she had a signed release the organization would not provide them per mother's request. The caseworker stated that because she only received attendance records, she had no knowledge as to whether mother followed through with any recommendations. She agreed that a caseworker's regular duties include reviewing progress notes and recommendations of mental health providers.

{¶ 32} Regarding the children's placements, the caseworker testified that when they returned from Florida they were placed with maternal grandmother. Following disposition, father had them for approximately two weeks then determined that he could

8.

only have them on the weekends. The agency also discovered that mother had been around the children. At that point, the children were returned to grandmother.

{¶ 33} As to the reasonable efforts the agency made regarding mother, the caseworker stated that the agency used funding to help her with utilities and informed her that if she found housing they would be able to pay the first and last month's rent. The agency referred mother to Joyful Connections for supervised visitation. At mother's request, the caseworker called a home for people with disabilities as a referral but they informed her that they needed a referral from mother's mental health counselor. The caseworker relayed this information to mother. The caseworker testified that mother refused help with transportation and job training and would not allow the caseworker in her home. The agency's reasonable efforts as to father included parenting class, an application for help with rent, information regarding day care, random drug screens, and home visits.

{¶ 34} The caseworker testified that in her opinion, it is in the children's best interests that maternal grandmother and her husband be awarded legal custody. She explained that the grandparents put the children's needs first. The caseworker stated that father failed to demonstrate that he could provide the children with a full-time safe and stable home. He also failed to financially provide for them. The caseworker stated that she had not been able to work with mother as much as she would have liked. She had no clear picture of her mental health status; she had not been in mother's home and had not met her roommate.

9.

{¶ 35} Mother's attorney cross-examined the caseworker on her mental health counseling. She testified that mother attended approximately half of her recent sessions. Mother canceled once due to a work conflict, once for unknown reasons, and the counselor canceled due to a conflict. The caseworker agreed that mother had a right to confidential counseling but stated that she needed some information because the agency's case stems mainly from concerns regarding mother's mental health. The caseworker agreed that mother completed parenting classes and answers her calls or immediately calls back.

{¶ 36} Father testified that he has lived in the same residence in Norwalk for over a year. He has known mother since high school and they have two children together. He stated that their relationship has been "up and down over the years" and that mother once threatened to skin him alive with a knife; he believed her at the time.

{¶ 37} In February 2023, the agency came to his home and informed him that mother had signed a safety plan with grandmother and that the children were staying with her. Father testified that he was in the process of moving and there was not much he could do to help. Father found out that the children were missing when grandmother texted him in the middle of the night trying to locate mother. Father stated that he determined that the car mother took had GPS by contacting the car dealership. After relaying this information to authorities, the sheriff's office in Jacksonville, Florida called him stating that they located mother and children. Father then informed the agency.

{¶ 38} The children moved in with father a week or two after mother and the children returned to Ohio. He stated that mother showed up at the house one morning

10.

and banged on the windows; she left within ten minutes. Father spoke with grandmother about it and decided to spare the children any additional trauma by not involving the police. After finding out that mother had been at the house, the agency placed the children with grandmother; father could visit without restriction. Father eventually began taking the children from Thursday evening until Saturday.

{¶ 39} Father testified that if the court awarded him custody his cousin, a stay-at-home mom who lives nearby, would help him with child care. Father's grandmother lives within walking distance and could serve as back up.

{¶ 40} Father testified that the garage conversion apartment is temporary and that once the lease is up on the three-bedroom, two bath house on the property he would rent that apartment. He stated that he and a partner own a gutter installation company and he nets $25,000 to $50,000 annually. Business slows considerably in the winter months.

{¶ 41} Father stated that he has a 15-year-old daughter from a prior relationship. When she was younger, he and mother shared custody. Now he sees her every other week for dinner or a similar activity.

{¶ 42} In 2015, father had back surgery resulting in chronic pain. Pain management prescribed pain medication and epidural shots which were not effective. They referred him to the suboxone clinic and the medication is working. Father denied ever using opiates. Father admitted that he got a medical marijuana card for his back pain in September 2023, and smokes marijuana every night. When he has the children, he smokes outside the home after they go to bed. Father agreed that he used marijuana

11.

recreationally prior to getting the card but that he stopped and waited once the agency opened the case.

{¶ 43} E.F., mother of father's oldest child, testified that when their daughter was younger, they had an informal parenting agreement where, for school purposes, she had the daughter during the week and father had her on weekends and in the summer. Father consistently paid the minimum monthly support order and also paid for things such as school supplies, clothing, shoes, and her cell phone bill. E.F. stated that father provided her daughter with a safe and stable environment.

{¶ 44} D.W. testified that mother had been living in his house for two months. The house has three bedrooms and D.W. stated that mother is able to use the extra bedroom for her children. D.W. expressed that mother is a good roommate who helps out around the house and cooks and cleans. He noted no concerns regarding her stability or mental health.

{¶ 45} On cross-examination, D.W. stated that he and mother did not have a lease agreement and she does not pay rent. He has not met her children. D.W. said that he has known mother approximately one year and told her she could stay with him until she could "get on her feet." He agreed that he could ask her to leave at any time.

{¶ 46} The agency called mother on cross-examination. She admitted that maternal grandmother is a safe custodian of her children but stated that in 2009, when she was 14, she was sexually abused by individuals both inside and outside her home. She brought it to grandmother's attention and it stopped immediately. Mother stated that the

12.

alleged abuser is not in grandmother's household and that the children would not be exposed to the individual.

{¶ 47} Mother's attorney recalled the GAL and questioned him regarding the 2009 sexual abuse allegations. The GAL stated that he learned of the incident from mother and it did not raise concern because the alleged perpetrators were not in the home.

{¶ 48} Mother's friend, J.B., testified that mother has been watching his children on and off for approximately seven months. He stated that he trusts mother around his children and she does really well with them.

{¶ 49} During cross-examination, J.B. stated that about four months ago mother lived with him because she needed a place to "get on her feet" and had been evicted from her prior residence. Mother left amid allegations that she set a dumpster on fire outside the residence. J.B. agreed to the possibility that she set the fire despite believing her denial. He stated that he would have her back as a roommate.

{¶ 50} J.B. observed no signs of mother's mental health challenges but said that she seemed depressed over losing her children. He had no idea whether she had been prescribed or was taking any medications. He stated that he heard her speaking on the phone with a counselor. J.B. testified that he never observed mother with her children.

{¶ 51} Mother testified that she understood why she lost custody of her children. She stated that she "went and got help immediately the second my health started to decline." She stated that she has a stable place to live where the children will each have their own bedroom and she is employed. She considers maternal grandmother the only

13.

person she trusts with her children and would keep her "number one" if she needed childcare.

{¶ 52} Mother stated that when the case began, she had "hormonal imbalances" due to recently giving birth to R.S. and at times was emotional and "illogical." Mother sought out family for respite from the children and began counseling. She explained that she initially sought counseling in 2019 after the birth of R.H. Her second pregnancy caused her to feel overwhelmed and she failed to consistently attend therapy. Consequently, her mental health declined.

{¶ 53} Mother testified that she has been taking ADHD medication for the past six months and feels much better. Mother consistently attends her counseling sessions and has gained skills to help her in everyday life. Mother stated that she is "one hundred per cent better now."

{¶ 54} Mother completed an online parenting class learning alternative ways to address a child's inappropriate behaviors. The classes also taught her how to cope with high stress parenting situations. Mother stated that she implemented the skills during supervised visitation but that she stopped going because it upset R.H.

{¶ 55} Mother met with the GAL three times, for ten minutes each time. She completed approximately 16 drug tests which were all negative. Mother met with the caseworker in person and virtually. Mother testified regarding the difficulties she had scheduling meetings with the caseworker. Screen shots of text messages between the two were admitted into evidence.

14.

**{¶ 56}** Mother testified that she does not know what happened to the records release she believes she signed with her mental health counselor. She denied wanting to preserve the confidentiality of her mental health information. She agreed that if she receives custody, she will continue her children in the services in which they are enrolled. She would also continue counseling and agreed that family counseling could help with reunification.

**{¶ 57}** On cross-examination, father's counsel questioned mother regarding her mental health diagnoses. Mother stated that she is taking ADHD medication and has not taken other mental health medications. Counsel questioned mother about the video she provided grandmother depicting father with marijuana and R.H. in the car. Mother stated that she wanted to use the video against father because he refused to stop smoking around the children. Mother agreed that her preference would be that grandmother, rather than father, have custody.

**{¶ 58}** The GAL cross-examined mother on her claims that they met for only ten minutes on three occasions. She stated that it seemed like only 10 to 15 minutes and that they did not have much to say to one another. Mother admitted that they first met during the height of her mental health crisis and she lacked clarity and was not forthcoming. Mother stated that her medication helped her "come back to normal feelings and energy and focus" and she is ready to parent full-time.

**{¶ 59}** The GAL questioned mother about the fact that since the start of the case, she has had three different residences and four different jobs. Mother stated that better

and more convenient jobs caused the frequent changes. Long term, mother plans to stay in the area and reside close to maternal grandmother.

{¶ 60} The agency's counsel questioned mother about preventing the release of her mental health counseling records. She denied blocking their release, stating that it was her counselor's suggestion that the records remain private. Regardless, mother thought that the records were being provided because the caseworker knew her attendance history. Mother claimed that the agency did not clarify that they wanted anything beyond attendance records.

{¶ 61} Mother's GAL testified that they have met in person and telephonically and that she reviewed the competency study completed in another court. She believes that mother is competent and that her testimony has been consistent with what mother has told her.

{¶ 62} On rebuttal, father testified his belief that mother took antidepressants and antipsychotics when they were living together; he observed the pill bottles. He stated that she had paranoia and that there were times when he would come to the house and check on the children and mother would not walk down the hall, even to use the bathroom, because she believed there was someone there.

{¶ 63} On May 2, 2024, the juvenile court granted the agency's motion for legal custody to be awarded to maternal grandmother and denied mother's and father's motions finding it in the children's best interests to remain with grandmother. The court reviewed all the testimony presented specifically noting that it considered the GAL's recommendations.

16.

**{¶ 64}** As to mother, the court discredited her testimony that her mental health is no longer an issue. The court found that mother minimized the issue by her refusal to disclose her medical records which were necessary "to support her current state of mental health." The court further concluded that mother has not been able to maintain safe and stable housing or employment.

**{¶ 65}** Likewise, the court rejected portions of father's testimony finding him to be "noncommittal, ambiguous, and evasive" regarding his plan for the children should he be awarded custody. Father's regular marijuana use troubled the court as did his failure to report mother's threats and attempts to gain unauthorized access to the children. The court further noted father's failure to provide support for the children during the pendency of the case.

**{¶ 66}** As to maternal grandmother, the court stated that she has a safe and healthy home which she shares with her husband and the children. The children have their own spaces. She arranges all their medical and dental appointments and sought help with developmental concerns. Grandmother provides all food and clothing and pays all expenses relating to the children.

**{¶ 67}** The court noted that throughout the proceedings it made determinations that reasonable efforts were made by the agency to "prevent the need for placement, to eliminate the continued placement, and/or to make it possible for the children to return home." This appeal followed.

17.

## II. Assignments of Error

Mother raises two assignments of error on appeal:

> 1. The Trial Court Abused its Discretion by Awarding Legal Custody To Maternal Grandmother Because It Did Not Consider All of the Statutory Factors Set Forth in R.C. 2151.414(D).

> 2. The Trial Court Went Against the Manifest Weight Of The Evidence When It Found Reasonable Efforts Because It Did Not Consider The Agency's Lack Of Efforts To Address Appellant – Mother's Mental Health Challenges.

## III. Analysis

## A. Legal Custody

{¶ 68} In her first assignment of error, mother claims that the trial court abused its discretion by awarding maternal grandmother legal custody of R.H. and R.S. without consideration of the statutory factors under R.C. 2151.414(D).  In addition, mother claims that the court failed to consider the interaction between the children.  R.C. 2151.414(D); R.C. 3109.04(F)(1)(c).

{¶ 69} A legal custody determination is reviewed for an abuse of discretion. *Blausey v. Blausey*, 2019-Ohio-4506, ¶ 13 (6th Dist.), citing *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988).  An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 70} Under R.C. 2151.353(A)(3), a juvenile court may award legal custody of any child to any person who files a motion seeking legal custody.  "In order to grant legal custody of a dependent child to a nonparent, the trial court must find, by a preponderance

18.

of the evidence that legal custody is in the child's best interest." *In re Am.H.*, 2019-Ohio-4374, ¶ 36 (6th Dist.), citing *In re Christopher M.*, 2007-Ohio-1040, ¶ 12 (6th Dist.); *In re A.B.*, 2020-Ohio-3990, ¶ 15 (6th Dist.). "In making such a determination 'courts have looked to the best interest factors of R.C. 2151.414(D), R.C. 3109.04(F)(1), a combination of the two, or general notions of what should be considered regarding the best interests of the [child].'" *In re A.D.*, 2017-Ohio-6913, ¶ 32 (6th Dist.), quoting *In re A.K.*, 2012-Ohio-4430, ¶ 25 (9th Dist.); *see In re J.D.*, 2024-Ohio-1443, ¶ 18 (6th Dist.). *See Matter of W.W.*, 2024-Ohio-878, ¶ 30 (4th Dist.).

{¶ 71} Thus, the juvenile court did not err in relying on the R.C. 3109.04(F)(1) factors when considering the best interests of R.H. and R.S. Further, there is no requirement that the court specifically enumerate all the factors in making a best interests custody determination. *In re H.H.*, 2024-Ohio-686, ¶ 74 (6th Dist.).

{¶ 72} After reviewing the record, the juvenile court did not abuse its discretion by concluding that it was in the best interests of the children to grant legal custody to maternal grandmother. The preponderance of the evidence demonstrates that for a large percentage of their lives, maternal grandmother has been the children's primary caregiver and has met all their emotional and health and safety needs, mother's mental health and housing conditions are not stable, and father does not have appropriate housing or the present ability to provide full-time care for the children. There is no evidence under the facts of this case that the interaction between the siblings has any bearing on the court's best interests' review. Mother's first assignment of error is not well-taken.

19.

## B. Reasonable Efforts

{¶ 73} Mother's second assignment of error is that the manifest weight of the evidence does not support the court's finding that the agency made reasonable efforts to address her mental health issues.

{¶ 74} A juvenile court's finding that an agency made reasonable efforts toward reunification is reviewed under a manifest weight of the evidence standard. *In re E.H.*, 2016-Ohio-8170, ¶ 23, citing *In re Er.P.*, 2014–Ohio–2831, ¶ 24-25 (6th Dist.). "'In a reasonable efforts determination, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute.'" *Id.*, quoting *In re S.R.*, 2013-Ohio-2358, ¶ 21 (6th Dist.). "'[R]easonable effort' is an 'honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage.'" *In re I.P.*, 2015-Ohio-4061, ¶ 37 (6th Dist.), quoting *In re D.H.*, 2013-Ohio-5286, ¶ 21 (6th Dist.).

{¶ 75} Here, the evidence reveals that the agency made reasonable efforts to aid mother but that she rejected the agency's help on multiple occasions, refused the release of her mental health records, failed to update the agency of address changes, and refused to allow the caseworker access into her home. Thus, the weight of the evidence supports the court's reasonable efforts finding. Mother's second assignment of error is not well-taken.

20.

## IV. Conclusion

{¶ 76} For the foregoing reasons, the judgment of the Ottawa County Court of Common Pleas, Juvenile Division, is affirmed.  Mother is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.             _____
                                             JUDGE

Gene A. Zmuda, J.                _____

Charles E. Sulek, P.J.                                      JUDGE
CONCUR.

                                               _____
                                             JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.