**[Cite as *In re L.G.*, 2026-Ohio-1684.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

In re L.G., G.G.

Court of Appeals No.   H-25-018
H-25-019

Trial Court No.  DNA 2024 046
DNA 2024 047

**<u>DECISION AND JUDGMENT</u>**

Decided:  May 8, 2026

* * * * *

Anthony J. Richardson, II, for appellant.

Loretta Riddle, for appellee.

* * * * *

**SULEK, J.**

**{¶ 1}** Appellant-mother A.O. appeals the judgment of the Huron County Court of Common Pleas, Juvenile Division, which granted appellee-father G.G.'s motion for legal custody of the minor children L.G. and Gi.G. For the reasons that follow, the juvenile court's judgment is affirmed.

## I. Factual Background and Procedural History

{¶ 2} A.O. ("Mother") and G.G. ("Father") have two children: L.G., born in 2019, and Gi.G., born in 2016. Mother and Father never married each other and no longer live together.

{¶ 3} On May 17, 2024, the Huron County Department of Job and Family Services ("Agency"), filed a complaint alleging that the children were dependent. The children had been living with Mother at the time, and their living conditions were described as "deplorable," with allegations that the home was filled with mud, animal urine, and feces. In addition, the Agency received reports that the children were physically abused and beaten with a belt by Father. On May 20, 2024, the children were placed in the temporary custody of Mother, under the protective supervision of the Agency.

{¶ 4} On July 11, 2024, the Agency filed for another shelter care hearing. It alleged that Mother talked about the case in front of the children and told the children that Father does not love them. The guardian ad litem further reported that the children were "out of control" with Mother, and that Mother's home continued to be unsanitary. At the shelter care hearing held the same day, the juvenile court placed the children in the temporary custody of Father, under the intensive protective supervision of the Agency. Mother was granted supervised visitation.

{¶ 5} On August 13, 2024, the juvenile court adjudicated the children dependent. At the subsequent dispositional hearing, the juvenile court continued the placement of the

2.

children in the temporary custody of Father, under the protective supervision of the Agency. Mother attempted to appeal the dependency adjudication, but this court dismissed her appeal as untimely.

{¶ 6} A further dispositional hearing was held on December 9, 2024, following which the juvenile court continued to place the children in the temporary custody of Father. The next month, Father moved for legal custody of the children.

{¶ 7} On February 25, 2025, Mother moved to modify visitation to allow her fiancé, B.C., to participate. The guardian ad litem opposed the modification. She reasoned that the children were not bonded with B.C. and he previously disciplined them with a belt. The guardian ad litem believed that Mother needed to learn how to discipline and control her children by herself, and that the visits would be more beneficial to the children if they were able to spend time alone with Mother. Father also objected to the modification. On March 7, 2025, the juvenile court denied Mother's motion.

{¶ 8} On March 21, 2025, Mother requested a shelter care hearing based on allegations that she heard about Father. The children reported that Father put soap and hot sauce in their mouths as discipline and hit their mouths and their buttocks. The juvenile court held a shelter care hearing, following which it continued the placement of the children in the temporary custody of Father.

{¶ 9} A further dispositional hearing was held on May 15, 2025. Again, the children were continued in the temporary custody of Father.

{¶ 10} On June 2, 2025, the matter came before the juvenile court for a non-oral hearing on issues concerning Mother's parenting time. The juvenile court clarified that Mother's visits should continue to occur in a restricted, well-supervised setting. The visits should occur bi-weekly, and at a minimum of once per month with each child. B.C. should continue to be excluded from visiting with the children.

{¶ 11} On July 30, 2025, the juvenile court held a hearing on Father's motion for legal custody.

{¶ 12} At the hearing, Angela Pocock, the case supervisor, testified for Father. Pocock testified in lieu of the ongoing case worker, Rachel Polinko, who was on maternity leave. Pocock explained that she spoke weekly with Polinko about the case and recently has been going to the visits in anticipation of having to testify. Pocock testified that the Agency became involved in 2024 in response to allegations made in a civil custody case between Father and Mother. Father alleged that Mother's home was unclean and unsanitary and that the children were unsafe with Mother. Mother likewise alleged that Father's home was unsafe.

{¶ 13} During the initial Agency involvement, the children "ended up having some bruise marks on them." The children indicated that Father caused the bruise marks, which prompted the Agency to file its complaint in dependency. In addition to the bruise marks, the Agency also expressed concern for the unsanitary conditions of Mother's home caused by her housing of 17 dogs. Further, it expressed concern that the children would come to visits at the Agency with feet that were black from dirt. Finally, the

4.

Agency had concerns that Mother was unable to control the children and manage their behavior safely. As an example, Pocock cited an incident where one of the children stabbed the other one with a pencil and Mother did not intervene.

{¶ 14} As the Agency continued its investigation, the children recanted their allegations of abuse by Father. They instead reported that it was Mother's fiancé, B.C., who had hit them with belts. The children have maintained that allegation ever since. This led to the Juvenile Court changing temporary custody of the children from Mother to Father.

{¶ 15} Pocock stated that since being placed in Father's care, the children's progress "has been very significant," and they are "doing extremely well in father's care." She noted that the children are in counseling bi-weekly, their schooling is improving, and Father has been following up on all their medical care. Pocock testified that the children have a strong bond with Father. Father's home is appropriate, and the children get along well with Father's girlfriend, her daughter, and the new baby that Father and his girlfriend have together.

{¶ 16} Pocock described Father's manner of discipline. Previously, there were concerns that Father would put hot sauce on the children's tongues when they used curse words. Since then, Father has completed the Ohio Guidestone Nurturing Parenting program, and he no longer uses that method of discipline. Instead, he implements time-outs or taking away the children's electronics. Pocock explained that recently, Father and

5.

Mother have been communicating better about the children's behavior and have been trying to co-parent better by discussing how to handle certain behaviors.

{¶ 17} As to Father himself, Pocock testified that he has completed all the case plan goals that were provided for him. As part of that, Father has been attending counseling. At first, Father was very resistant to the Agency, and the Agency's involvement triggered his Post-Traumatic Stress Disorder. On cross-examination, Pocock described that approximately five months after the children had been placed with Father, things were not going well, and the Agency contacted Father's sister as a potential alternative placement. When Father learned of this, he was extremely upset and it triggered what Pocock described as a "mental health crisis." He contacted the Agency and yelled at the staff and called them derogatory names. When he "deescalated" from his emotional outburst, Father apologized for his behavior. Pocock stated that Father has been showing "significant improvement with his triggers and being able to deescalate himself when it comes to us coming into his home." Father is now "very cooperative" with the Agency.

{¶ 18} Overall, Pocock testified that the Agency was in support of Father's motion for legal custody. According to her, Father and the children have shown tremendous progress, and it was "very clear . . . that is where they need to remain."

{¶ 19} Pocock then turned her testimony towards Mother. Pocock testified that Mother went from having the children living with her to supervised visits because of the incident where one boy stabbed the other with a pencil, and because of the children's

6.

reports that B.C. had hit them with belts. She stated that Mother and B.C. admitted to using belts on the children but denied leaving any marks or bruises on them.

{¶ 20} The Agency is concerned that there has been minimal improvement in Mother's parenting skills. Mother had a psychological evaluation done that indicated she needed repeated exposure to parenting skills and practices to better understand them. To that end, Mother has completed Ohio Guidestone Parenting Training at least twice, and she goes over her parenting practices at every session with her counselor. Nonetheless, the staff still needs to intervene during Mother's supervised visits. As an example, the children love Mother and are bonded to her and exhibit attention-seeking behavior towards her, but when she gives attention to one child, it leads to conflict between the children, and typically the staff must intervene to help stop that. Pocock noted that the children "are very different with mom as compared to dad." They do not follow Mother's directions well, and "[i]t takes a lot to try to redirect them and get them to listen and follow directions." In addition to concerns about Mother's management of the children's behavior, Pocock noted concerns that Mother has "cussed" at the children during the supervised visits, has discussed the case in front of the children, and has tried to talk about her parenting with the staff during the visits instead of waiting until after the children had left. Pocock did state, however, that the visits have been "going much better" since the children have started meeting with Mother individually. In light of her views of Mother's progress, or lack thereof, in developing parenting skills, Pocock recommended that she continue to have supervised visitations with the children.

7.

{¶ 21} Regarding B.C., Pocock testified that the Agency had many concerns about him. Pocock started with the fact that B.C. disciplined the children with a belt and the children are afraid of him. The children stated that they would be okay with visits with B.C. only because they were supervised and they knew that he could not beat them with belts. Pocock also identified a concern that B.C. was not cooperative with the Agency. He completed an initial mental health assessment, which did not recommend any further services, but he has since refused to participate with the Agency. When the Agency shows up to speak with him, he would say "I don't want to talk to you," and would then leave the house. Pocock recommended that B.C. continues to not be part of Mother's visitations.

{¶ 22} Carrie Kimmet, the guardian ad litem, also testified for Father. She testified that the change in guardianship from Mother to Father occurred due to concerns regarding Mother's parenting and supervision of the children. She explained that although the children showing up to visits with black feet and having marks and bruises on their bodies were factors, the main reason was the children's behavior during interactions with each of the parents. When Kimmet observed the children with Father, she did not observe anything of concern. Father was able to redirect the children using his words, and the children would obey. With Mother, however, the children were "out of control." During Kimmet's first interaction with them, the children attempted to barricade Kimmet in their room with a dresser. She told them that was inappropriate, but they did not listen to what she said. While Kimmet was physically moving the dresser

8.

out of the way, the older child began stabbing the younger child in the back with a pencil. Overall, the children were screaming at each other, running around, and yelling. Kimmet had to ask Mother to intervene, and she had the impression that Mother would not have done anything had Kimmet not asked.

{¶ 23} Since the children have been placed with Father, Kimmet has conducted more than 20 visits to Father's house. She stated that she has not had any concerns with his interaction with the children. The children do not always listen and do not always have great behavior, but Father is able to redirect them. Kimmet was also able to observe the children's interaction with Father's girlfriend's daughter and the new baby. Kimmet described the interactions as normal, "sibling-type" relationships.

{¶ 24} Regarding Mother, Kimmet has only observed one of the supervised visits. She stated that the children acted strangely while she was there, and she determined that she was interfering with the visit, which she did not want to do. From reviewing the staff notes of the supervised visits and speaking with the supervisor, Kimmet testified that Mother has been stagnant in her progress with her parenting behaviors. During her supervised visits, Mother has threatened the children with physical discipline when they were not listening. Mother has also spoken with the children about the case despite being asked not to, asking questions such as "Where do you want to live?", "Do you want to see [B.C.]?", "What's going on at [Father's] house?". These behaviors and questions have required intervention by the supervising staff. Kimmet acknowledged, however, that Mother's parenting behaviors have been getting better recently.

9.

{¶ 25} Kimmet also testified concerning the children's wishes. Although both have had periods where they have waivered, the older child has mostly expressed a desire to live with Father, and the younger child has mostly expressed a desire to live with Mother. Both have had complaints about Father, but those complaints have largely centered around things that were a safety issue, or that provided structure and guidance. Kimmet identified that the children have demonstrated that they respond well to structure and guidance, but "they do not like it. They do not like it at all." Both children have also indicated that they are afraid of B.C., but that Mother has coached them to say that they want to see B.C.

{¶ 26} Kimmet's final recommendation was that the children live with Father, have supervised visits with Mother, and not have any contact with B.C. She doubted that Mother would be able to progress to unsupervised visits because Mother would not drive herself to the visit and either B.C. or his mother would always be with her. Kimmet expressed concern about the trauma that being around B.C. would cause the children. It was her position that so long as Mother remains in a relationship with B.C., visits should remain supervised.

{¶ 27} Lastly, Kimmet testified that she has not had any concerns regarding Father's behavior towards her. Since the children have been placed with him, he will reach out to Kimmet to provide her updates on the children and the case, and he timely responds to her inquiries. She did describe one situation prior to the change of placement where Father called her upset because he felt like people were not listening to his

10.

concerns about Mother's treatment of the children. During that call, Father's emotions were escalated and he was yelling, but Kimmet appreciated that he "was very emotional and opinionated about what he felt was the safety of his children."

{¶ 28} On cross-examination, Kimmet testified to the incident in November 2024 when Father became very upset and had a mental health crisis that resulted in him calling the Agency and threatening its workers. Kimmet noted that around that time, Father's girlfriend—who was still pregnant with their child—had left him. She stated that Father's behavior was concerning, but she said she could not make the leap in logic that his behavior indicated an inability to control his emotions and anger in any situation.

{¶ 29} Father then testified. As background information, he testified that he began living with Mother in 2015 and they separated around the beginning of 2021. Mother has two other children, an older, teenage son who Father never met, and a 9-year-old daughter. She does not have custody of either of those children. After the parties separated, there was a period where Father was not able to see his children because Mother filed a restraining order against him. She filed the restraining order 45 days after they separated, but only twenty minutes after she lost custody of her daughter. According to Father, the trial court judge found that timing "coincidental." The allegations included that Father held Mother hostage. He noted that he has a felony kidnapping on his record, so if he held anyone hostage he would go straight to jail. But he was never criminally charged based on any of the allegations and the restraining order was lifted. He then

11.

initiated a civil case against Mother to get visitation rights. As that case was pending, the Agency filed its complaint in dependency.

{¶ 30} Father testified that he was currently living in Cleveland with his fiancée, her 9-year-old daughter, and their 9-month old baby. He stated that all the kids get along well together and have typical sibling relationships. The children also get along well with Father's fiancée and they express love for her every day.

{¶ 31} Regarding education, the children are enrolled in a private, tuition-free school. The school offers smaller classrooms and more individualized attention. Father testified that the children are making a lot of progress academically.

{¶ 32} Father also testified about their recreational activities. He stated that they stay constantly active, going fishing, riding bikes, playing with RC cars, or going to the flea market.

{¶ 33} Medically, the children have both had their tonsils and adenoids removed. The older child was obese, and Father helped him lose eight pounds in 21 days by simply reducing the portion sizes of what he was eating. They otherwise have no medical concerns. They are, however, in counseling. Father believes—and the counselors are working to determine—that they have PTSD from abuse that occurred while they were with Mother. He described that before visits with Mother, the children's behavior will escalate. He also described that the younger child has accidents in his pants around the time of the visits. The counselors are investigating whether the visits and the accidents are related. According to Father, part of what causes the children anxiety is that B.C. is

12.

often in his car in the parking lot during their visits with Mother, even though he is not supposed to be.

{¶ 34} As to Father, he normally works construction, but he is currently unemployed due to a shoulder injury that requires surgery. On the mental health front, Father still attends weekly counseling, which he intends to continue even after the case ends. He has been diagnosed with PTSD from an incident involving law enforcement when he was a young child. He believes that his diagnosis helps him better understand his children. Father has learned to address "triggers" by either contacting his counselor or walking away from the situation. He described that his PTSD had only been triggered one time in the six months preceding the custody hearing and that he was able to effectively deal with the situation.

{¶ 35} Overall, Father believes that the children are doing well in his care, and that it is in their best interest to remain with him. He believes that Mother should still have supervised visits. Following Father's testimony, he rested his case.

{¶ 36} Mother then briefly recalled Pocock. Pocock acknowledged that there were notes from a supervised visit on January 2, 2025, that the children stated that they wanted to see B.C., as well as a similar note from February 4, 2025. On cross-examination, she testified that there were concerns that the children were being coached in their statements, and she noted that subsequently in March 2025, they began to disclose that they were afraid of B.C. and that he hit them with belts. On re-direct, Pocock admitted that there had been concerns of coaching from both parties.

13.

{¶ 37} Finally, Mother recalled the guardian ad litem. Kimmet testified regarding a time in February 2025—around when Mother moved to modify her visitation to include B.C.—when she went with the ongoing caseworker to see the children at Father's house. At that time, the older child expressed that he would like B.C. to come to visits "sometimes, but not all the time." Kimmet, however, recalled that the child's demeanor was "unlike his demeanor that I had ever personally experienced on any other day." She described the visit as "extremely chaotic." The children were saying things, then recanting things, and she "had no idea what was true, what wasn't true, what they were saying, because they just kept saying, changing what they were saying."

{¶ 38} Following Kimmet's testimony, Mother rested. The parties gave their closing arguments, and the juvenile court took the matter under advisement.

{¶ 39} On August 7, 2025, the juvenile court entered its judgment awarding legal custody of the children to Father and ordering that Mother have supervised visitation. In so doing, it considered the factors set forth in R.C. 3109.04(F) and determined that legal custody to Father was in the children's best interests. The juvenile court reasoned:

> [Father] desires both children to be placed in his legal custody. [Mother] did not testify, but her attorney relates that her position is that the children should remain in the temporary custody of their father under the protective supervision of the agency while counseling for all parties continues. The Court did not interview the children in chambers, and no party requested such an interview, but the children's guardian ad litem relates that neither is able to meaningfully express their wishes and concerns to the Court. The children love both of their parents and exhibit a bond with them. The children interact very well with [Father]'s girlfriend and the other children in their home. The children continue to express fear of [Mother]'s boyfriend, who is a trigger for their PTSD symptoms. The

children are settled in to their home in Cleveland with their father, where they have lived for over a year. They are integrated into their neighborhood and school. They are responding favorably to [Father]'s parenting. [Father] continues to receive treatment for his own diagnosis of PTSD, and is much improved with managing his symptoms. [Father] has demonstrated the ability and commitment to ensure that [Mother] is able to exercise the visitation this Court has ordered. He has regularly transported the children from Cleveland to Sandusky and back for this purpose. [Mother] has been observed coaching the children to have unfavorable views of their father. No evidence was presented suggesting that either parent intends to relocate from their current residences.

## II. Assignments of Error

{¶ 40} Mother timely appeals the August 7, 2025 judgment, asserting two assignments of error for review:

1. The trial court committed reversible error when awarding legal custody.

2. The trial court committed error by placing limitations on visitation.

## III. Analysis

{¶ 41} In her first assignment of error, Mother argues that the trial court's decision to award legal custody of the children to Father constituted an abuse of discretion.

{¶ 42} Under R.C. 2151.353(A)(3), if a child is adjudicated abused, neglected, or dependent, a juvenile court may award legal custody of the child "to either parent . . .." "Once the case reaches the disposition phase, the best interest of the child controls." *In re D.A.*, 2007-Ohio-1105, ¶ 11. In making a determination of what is in the best interest of the child, juvenile courts "have looked to the best interest factors of R.C. 2151.414(D), R.C. 3109.04(F)(1), a combination of the two, or general notions of what should be

considered regarding the best interests of the [child]." *In re A.D.*, 2017-Ohio-6913, ¶ 32 (6th Dist.), quoting *In re A.K.*, 2012-Ohio-4430, ¶ 25 (9th Dist.); *see In re J.D.*, 2024-Ohio-1443, ¶ 18 (6th Dist.). Those factors include, inter alia, "[t]he child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;" "[t]he child's adjustment to the child's home, school, and community;" "[t]he mental and physical health of all persons involved in the situation;" and "[t]he parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights." R.C. 3109.04(F)(1); *see also* R.C. 2151.414(D)(1)(a).

{¶ 43} "Because custody determinations are 'some of the most difficult and agonizing decisions a trial court must make,' a trial court judge must have broad discretion in considering all of the evidence." *In re O.S.*, 2025-Ohio-776, ¶ 71 (6th Dist.), quoting *In re H.H.*, 2024-Ohio-686, ¶ 64 (6th Dist.), quoting *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997). "Therefore, an award of legal custody will not be reversed on appeal absent an abuse of discretion." *Id.*, quoting *In re H.H.* at ¶ 64. An abuse of discretion connotes that the trial court's decision was unreasonable, arbitrary, or unconscionable. *In re R.H.*, 2025-Ohio-1377, ¶ 69 (6th Dist.), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 44} In support of her assignment of error, Mother characterizes the evidence as showing that the initial concerns that led to the removal of the children from her home have been ameliorated. Specifically, she has removed most of the dogs and her home is

now clean. More importantly, she states that she and B.C. have completed the case plan recommendations to take parenting classes and engage in counseling. She further states that the children's allegations that B.C. has hit them with a belt are unreliable in that the children are not trustworthy or credible. Finally, she characterizes Father as aggressive and threatening, and she speculates that the Agency and the juvenile court have "allowed [Father]'s threats to scare them into disregarding [Mother]'s parental rights completely."

{¶ 45} In this case, the juvenile court did not find the facts to be as Mother described. Instead, the juvenile court found that it was B.C. who hit the children with belts, and there is no credible evidence that Father physically abused them. Further, the children, who were "out of control" in Mother's care, are doing well in Father's care. They are well-bonded with Father, his girlfriend, and the other children in the home, with whom they have a "sibling relationship." The children are active and healthy, and Father has helped manage the older child's weight. They are also progressing well in school. In addition, Father and the children are receiving counseling, and Father has demonstrated an ability to manage his PTSD. Finally, Father has consistently facilitated visitation with Mother.

{¶ 46} For these reasons, the guardian ad litem recommended that it was in the best interests of the children for legal custody to be awarded to Father. The juvenile court agreed, and this court cannot say that its decision was unreasonable, arbitrary, or unconscionable. Accordingly, the juvenile court did not abuse its discretion when it awarded legal custody of the children to Father.

17.

{¶ 47} Mother's first assignment of error is not well-taken.

{¶ 48} In her second assignment of error, Mother challenges the juvenile court's award of limited supervised visitation. The juvenile court granted Mother "supervised visitation with the children at a supervised visitation program approved by the children's legal custodian." At the time of the order, the visits were occurring at Kinship. The juvenile court ordered that "[w]hile at Kinship, the visits shall continue to be one-on-one with each child and [Mother], and shall continue to occur bi-weekly, and at a minimum of once per month with each child. [Mother]'s boyfriend, [B.C.] shall not participate in any of [Mother]'s visits."

{¶ 49} Mother argues that the juvenile court's order interferes with her substantive due process rights to raise and care for her children. She asserts that the intrusion on her ability to visit, bond with, and take part in raising her children cannot be constitutional where the reasons for ordering supervised visitation are based on "speculation and untrustworthy information or conjecture."

{¶ 50} R.C. 2151.353(A)(3)(c) provides that noncustodial parents "have residual parental rights, privileges, and responsibilities, including but not limited to, the privilege of reasonable visitation . . .." "In ordering visitation, the juvenile court must consider the 'totality of the circumstances as they relate to the child's best interest.'" *In re C.L.*, 2021-Ohio-3819, ¶ 28 (8th Dist.), quoting *In re K.D.*, 2017-Ohio-4161, ¶ 27 (9th Dist.). "A court's determination as to visitation is reviewed for an abuse of discretion." *Id.*, quoting *In re K.D.* at ¶ 26; *see also In re Anna H.M.*, 2003-Ohio-6746, ¶ 10 (6th Dist.) ("[W]hile

18.

a trial court's orders with respect to visitation must be just, reasonable, and consistent with the best interest of the child, an appellate court must review a trial court's decision with respect to visitation with deference and will reverse only if the trial court abused its discretion.").

{¶ 51} Here, Mother continues to reside with B.C. Based on the testimony from the hearing, the juvenile court found that, after recanting their allegations against Father, the children have been consistent in reporting that B.C. had hit them with belts. In addition, Pocock testified that Mother and B.C. admitted that belts were used for discipline, although they denied leaving any marks or bruises. Consequently, the children reportedly fear B.C., and Father testified that the children are distressed even when they see B.C. waiting in the car during Mother's supervised visits. Requiring supervised visitation without B.C. present is therefore not unreasonable, arbitrary, or unconscionable.

{¶ 52} Furthermore, Pocock and Kimmet testified that Mother's visits have often required staff intervention. The children are unruly for Mother, and she has responded by threatening physical discipline. Mother has also inappropriately spoken about the case in front of and with the children. Although the visits have improved since Mother began seeing the children individually, the Agency still has concerns that Mother's parenting skills have stagnated, despite her completing two parenting classes and speaking about her parenting skills with her counselor. Given the concerns surrounding Mother's ability

19.

to appropriately parent the children in a non-supervised setting, the juvenile court's order of supervised visitation is not unreasonable, arbitrary, or unconscionable.

{¶ 53} Accordingly, the juvenile court did not abuse its discretion when it ordered supervised visitation. Mother's second assignment of error is not well-taken.

### IV. Conclusion

{¶ 54} For the foregoing reasons, the judgment of the Huron County Court of Common Pleas, Juvenile Division, is affirmed. Mother is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.

| | |
|---|---|
| Gene A. Zmuda, J. | |
| | JUDGE |
| Myron C. Duhart, J. | |
| | JUDGE |
| Charles E. Sulek, J. | |
| CONCUR. | JUDGE |

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.